**Pages 1 - 24**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

AVAGO TECHNOLOGIES GENERAL IP )
(SINGAPORE) PTE. LTD.,        )
                              )
          Plaintiff,          )
                              )
  VS.                         )    **No. C 15-4525 EMC**
                              )
ASUSTEK COMPUTER INC. and ASUS )
COMPUTER INTERNATIONAL,       )
                              )
          Defendants.         )
_____)    San Francisco, California
                                    Thursday, January 21, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

          KILPATRICK TOWNSEND & STOCKTON LLP
          1400 Wewatta Street, Suite 600
          Denver, Colorado 80202
     BY:  **DAVID E. SIPIORA, ESQUIRE**

For Defendants:

          ALSTON & BIRD LLP
          2828 N. Harwood Street, Suite 1800
          Dallas, TX 75201-2139
     BY:  **SANG (MICHAEL) LEE, ESQUIRE**

**Reported By:  Katherine Powell Sullivan, CSR No. 5812, RMR, CRR**
          **Official Reporter**

**Thursday - January 21, 2016**                              **1:39 p.m.**

                           **P R O C E E D I N G S**

                              ---ooo---

        **THE CLERK:**  Calling case C 15-4525, Avago Technologies versus Asustek.

     Counsel, please come to the podium and state your name for the record.  Please state your name for the record.

        **MR. SIPIORA:**  Good afternoon, Your Honor.  David Sipiora for plaintiff Avago.

        **THE COURT:**  Thank you, Mr. Sipiora.

        **MR. LEE:**  And Michael Lee for defendant ASUSTek Computer Inc. and ASUS Computer International.

        **THE COURT:**  All right.  Thank you, Mr. Lee.

     Our rules require a showing of diligence, obviously, to amend at this point.  Tell me why you think your clients have made that showing.

     I mean, to add now 650 products at this stage of the litigation, summarize for me why you think the diligence standard has been met here.

        **MR. SIPIORA:**  Sure.

     The case was filed, obviously, in Texas back in February. The initial -- under Eastern District of Texas rules.  Under those rules, we served initial discovery on May 12.  And May 15 we served our preliminary infringement contentions.  At that time we identified approximately between 180 and 200 products

that were available on the market and had the requisite functionality that we believe were infringing.

In the discovery that we served at that same time, or several days before, we had identified or asked for information about other products that were reasonably similar.  And we knew at the time there were additional products.  But the ability to determine whether or not they were in the U.S. was an open question.  We determined --

**THE COURT:**  Why is that such an open question?  Why couldn't that have been determined, certainly, sooner than when this motion was filed?  If that's the only issue, whether it was available in the U.S. --

**MR. SIPIORA:**  What happened with this case was we served the discovery on May 12.  They responded in June and then immediately began to dialogue on obtaining the requisite information with respect to these products.

The issue is not whether or not we could find information on the specific products.  That was available.  The issue was whether or not we could establish that it was available for sale in the United States during the relevant time period.  And that was not something that could easily be determined.

**THE COURT:**  Why is that?

**MR. SIPIORA:**  Because -- well, it's in the past, number one.

So if you go to look at their website, for example -- I'll

give you an example.  And I have a binder I actually brought with me.

Their Exhibit D, when they actually gave us the information, they said:  Here are links to our information that will show you information on this product, and you could have looked at this for the 650 products.

We've looked at that.  And of those 650 products that were identified, 85 percent of the citations were to foreign websites or to what are called global English websites, which have generic sites that don't give you any indication where the product is offered.  Only 15 percent of the things that they identified after the fact actually connect to the United States.

You could find ASUS websites, but you couldn't establish -- they sell all over the world.  The products have many, many numbers.  And at the time we filed the complaint, we made the determination that we would identify the products that we could, that were available in the U.S.  And then we immediately served discovery and asked for information about additional products that were reasonably similar.

Within the period of time from the time we served discovery, which was -- as I said, May 12 they objected; on the 15th of June we began that process.

And by July -- so within six to eight weeks of the time we started the process and negotiation, they identified 650

additional products.  They gave us the identification of the products but said, We're not going to give you any documentation with respect to them.  And the reason they stated was, Well, because you could have found this information earlier.

And we don't dispute we could have found the technical information on the Internet.  But we couldn't have established, by any reasonable means, that it was actually on sale in the United States.

And I would submit the evidence that they submitted to the Court, Exhibit D, which is their links to 650 different locations, 85 percent of those are not to -- to U.S. locations.

THE COURT:  How do you know if it's a U.S. location or not?

MR. SIPIORA:  So what we did is we looked at all of them.  There were 649.  I'm rounding to 650.  344 of them were global sites.  They're just global linkage.

If I can hand up a binder, it would help to demonstrate a couple.

THE COURT:  Okay.

MR. SIPIORA:  Thanks.

So if you turn -- I gave two examples.  Under the first tab, global sites, this is an example, product EE PC 1005HA. If you look at this, it does have information about the product.  But if you turn to page 4 of 4 -- top right says 4 of

4.

**THE COURT:**  Yeah.

**MR. SIPIORA:**  The second says (unintelligible) logo. You see there the first paragraph.  Right below that, the second paragraph, "Product specifications may differ from country to country.  We recommend that you check with your local dealers for the specification of the products available in your country."  And you look down at the bottom, the very bottom left says "Global English."

Of the sites that they've identified in their Exhibit D, 53 percent -- which they said we could have checked -- 53 percent, fully half of them, were like this.

**THE COURT:**  All right.  Well, let's say you have this product now, this EE PC 1005HA.

**MR. SIPIORA:**  Yes.

**THE COURT:**  How would you go about determining whether this was available in the United States?

**MR. SIPIORA:**  They would have to tell us.

**THE COURT:**  You have no way of knowing?  You could not determine whether this product was for sale from any U.S. distributor?

**MR. SIPIORA:**  Well, for some distributors they're not publicly available, so the answer is absolutely no.

In theory, you could have gone to all websites of every potential distributor, Best Buy, Wal-Mart, every --

THE COURT:  Yeah.

MR. SIPIORA:  -- and looked at all those websites and looked to see if we could find some of these products.

THE COURT:  Or Google it in the reverse order.  Put this in and see who sells it; discount price; whatever; and see what distributors.  Best Buy comes up, bingo.

MR. SIPIORA:  Well, you're not going to find -- you find it for sale now, potentially.  But the issue here is whether it was for sale in the past.

We identified every product --

THE COURT:  You can't use some archived process?

MR. SIPIORA:  That's what they're suggesting we should have done.  We should have gone -- we identified the 200 products.  And they say, You should have gone back and looked at all archival records through a third-party website.

ASUS's website wouldn't tell you this.

THE COURT:  And did you propound specific interrogatories asking specifically the question whether these 650 products -- immediately after getting the products, did you propound discovery to find out whether these were available for sale in the United States?

MR. SIPIORA:  We asked before they gave us the information.  Three days before we served our PICs, as reflected in our brief on page 8, we said in our interrogatories -- if you take a look at that page.  This is in

our reply brief, which is docket number 115 on page -- sorry, page 6.  Our second interrogatory stated -- we asked in number 1, "Give us all the accused products that have this functionality."

And in number 2 we said -- second interrogatory, before we served our PICs May 2015 -- "For each accused product identified in response to Interrogatory No. 1, state..."

C we said "the date the accused product was first offered for sale or actually sold in the United States.  D "the date the accused product was first imported --

**THE COURT:**  This refers to accused products.

**MR. SIPIORA:**  Right.

**THE COURT:**  At the time, the 650 weren't accused products.

**MR. SIPIORA:**  Well, it's an open interrogatory.  We --

**THE COURT:**  I'm asking after you got the list of 650.

**MR. SIPIORA:**  Yes.

**THE COURT:**  Right.  Immediately or sometime shortly thereafter did you then ask specifically about the geographic availability of those 650?

**MR. SIPIORA:**  We understood them to be, according to the definition they gave us, they were sold in the United States.  That's why they identified them.

**THE COURT:**  Oh.

**MR. SIPIORA:**  That was why it's on the table.

**THE COURT:** So they were already identified through the discovery process of being 650 other products as designated by defendant as being sold in the United States?

**MR. SIPIORA:** As being -- well, I don't know -- as responsive to this discovery request, they produced this information.

**THE COURT:** Why isn't that good enough if that's -- why didn't you amend at that time?  They've already admitted it.

**MR. SIPIORA:** We moved to compel then.  This is in Texas now.  So we moved to compel -- what they did is they identified the products.  They said, We'll tell you what the products are, but we're not going to give you the documentation behind them.

**THE COURT:** But they've already represented, perhaps inferentially, that these were U.S. products.

**MR. SIPIORA:** Right.

**THE COURT:** U.S.-available products.

**MR. SIPIORA:** Right.  We understood that.

**THE COURT:** So why not move to amend your infringement contentions back then?

**MR. SIPIORA:** We could have.  We were at the point -- if you recall this case, we moved to compel under those rules under Texas.  And then at the time that was pending, to get the information, the case was transferred to this court.  After it

was transferred, all motions were vacated.  And in this court we moved to compel and we moved to amend the PICs.

Under Texas rules we believe it was sufficient at the time, under those rules, to simply go get the information.  We could amend the PICs as we went through this.  The rules are not quite as stringent as they are here.

**THE COURT:**  What notice did you give, in advance of moving to amend the PICs, that this was your intent; that you felt that the 650 were going to come into the case; it's already been represented that they were available in the U.S. by virtue of the discovery responses by ASUS?

**MR. SIPIORA:**  The case was transferred in October of this year.  And in November, when we got here -- you might recall, there was some confusion in the case; got lost for a period of time.  It ended up on the docket.

We told them in November that we were going to amend the PICs.  We had pending at the time of the transfer the motion to compel in Texas to get the additional information, because they didn't have to be part of the PICs in Texas to get the information.

**THE COURT:**  And the 650 products were identified in July, you say?

**MR. SIPIORA:**  They were identified July 31st. Effectively the first of August.  July 31st.

**THE COURT:**  So if there's any delay, it would have

been in the months of August, September and October, before you indicated in November.  So that's about three to four months.

**MR. SIPIORA:**  Well, we moved to compel -- so 7/31, they produced the information.  8/14, we moved to compel. 9/25 --

**THE COURT:**  Did you move to compel information about availabilities of sales in the U.S.?

**MR. SIPIORA:**  Yes, all around this product.  We moved on these specific products to get the information.

On the sales information, we understood that by identifying these products that they're only relevant if they're in the U.S.  In other words, they took the position that, We're giving you information on U.S. sales.  So that's what they gave us.

**THE COURT:**  All right.  So you knew by July 31st these were U.S. sold?

**MR. SIPIORA:**  We believed they would be, yes.

**THE COURT:**  So why the delay until November in indicating you were going to move to amend the PICs?

**MR. SIPIORA:**  Well, because under Texas rules we didn't think we needed to.  We moved to compel to get the information two weeks later.  And while that was pending the case was transferred.

There wasn't any requisite -- at that time in Texas, there wasn't any need to move to amend the PICs, in our view.

**THE COURT:**  Unlike our rules.

**MR. SIPIORA:**  The rules are more strict here about amending things.

**THE COURT:**  So it's a discontinuity in the rules that explains the delay?

**MR. SIPIORA:**  Well, it was wasn't attributable to delay, Your Honor.  9/25 the case was transferred.  There was about a month of not knowing where we were because this case got lost for some period of time.  And then it came back on -- came to this docket.

And then we contacted them within a month and said we're -- we decided under these rules that we'll amend the PICs and move to compel both; better do both.  Belt and suspenders here.  And that's what we did.

At the time we moved, we gave them the amended PICs, which was, I think, November 17, a couple of days before our first CMC.  We hadn't even had a CMC in this case.  There's absolutely no prejudice here; the second prong of this.

**THE COURT:**  Let me hear from you.  What's the problem?  Given the circumstances, had this case originated here and one side waited for five/six months, I could see an argument.

But given what's been represented, that the rules regarding amendment of PICs are different in Texas, and there was a transfer here, some discontinuity, some mixup here that this case was, I guess, in -- I forget exactly what happened,

but it was in limbo for a bit.  So, at best, there was a delay of maybe three months, four months.  But some of that was taken up by the transfer of business and living under a different regime.

So what's the problem?

**MR. LEE:**  Your Honor, diligence with respect to bringing the motion is just one aspect of this case, of this particular issue.  It's really the diligence in their efforts to investigate pre-suit these products; whether they were sold in the U.S. or not.  That was all publicly available to them. And that is the primary issue here.

As far as the delay, we do sympathize with plaintiff in terms of the transfer and such.  But back to your point, Your Honor, we provided this information very specifically saying these are the products that ASUS sells in the U.S.

**THE COURT:**  And that was done on July 31st?

**MR. LEE:**  That was July 31st, yes, Your Honor.

**THE COURT:**  And had they acted with diligence, they would have taken action shortly thereafter, in your view? That's where the non-diligence occurred?

**MR. LEE:**  Well, as far as getting their motion to amend on file, yes, they did not show diligence with respect to that.

But the more egregious issue is the fact that there was publicly available information; that they didn't make diligent

efforts to add or investigate these additional products before serving their PICs.

THE COURT:  Before serving the original PICs.

MR. LEE:  Yes, Your Honor.

THE COURT:  Which was when?  When did they serve the original?

MR. LEE:  This was May 15th, Your Honor.

THE COURT:  And can you cite any prejudice as a result of not including these in the original PICs or moving more quickly after the July 31st disclosure?

MR. LEE:  Yes, Your Honor.

But as an initial matter, if defendant -- if plaintiff can not prove diligence, the Court need not consider prejudice. But definitely there is prejudice to defendants in this case.

ASUS had substantially completed its document production back at the end of August, due to the many demands that plaintiff has requested of us in terms of supplementing our document production as well as our interrogatory responses. And that was with respect to 200 products.  And there was -- there was, obviously, very significant time and cost exposure.

Now they're going to be adding 650 additional products, which will take exponentially more time and effort.  In particular, I wanted to highlight that they're not only seeking the information that's readily on hand, they're seeking, also, an identification of the relevant components in each of ASUS's

products.

And that was a significant undertaking that we had done our -- we had one of our best associates spend nearly a month going through all the information that's publicly available, as well as information that was -- the documents that were served, to generate this thousand-entry chart.

**THE COURT:**  So you're saying they have to go back over the same ground, now, to look for different information?

**MR. LEE:**  Yes, Your Honor.  For 650 additional products that's -- that's quadruple the number of products.

**THE COURT:**  Well, I know it obviously means more time. What's the prejudice -- had they done 850 to start with, as opposed to breaking it into 200 and 650, what's the difference?

**MR. LEE:**  Well, for one, Your Honor, if they had done that from the beginning, we could have just started doing all these at one time, instead of piecemeal; going through a database and going -- for our client to consult each of the different branches in ASUS to get the information necessary, that is a significant undertaking.

**THE COURT:**  So there would have been some economies had all 850 products been identified at the outset, in terms of your sweep of information?

**MR. LEE:**  Yes, Your Honor.

**THE COURT:**  What's your explanation as to their claim that you weren't diligent in serving the original PICs back in

May; you could have found this 650 products.

MR. SIPIORA:  As I said, even the evidence they've submitted we couldn't have found them necessarily.  There are bits and pieces.  We might have found some potentially.  But as demonstrated --

THE COURT:  What was missing?

MR. SIPIORA:  Information about whether they were available in the U.S.

THE COURT:  The nature of the products was not the problem.  It's the sales?

MR. SIPIORA:  It's the sales.  And as reflected in the information they cited, they know where they sell.  In this motion they submitted exhibits E, I, J, and K.  And they said, You can go look at these documents and they'll tell you information about the products.

And that's true.  But as reflected in these documents that I've handed up, they relate to foreign activities and generic information about the products.  85 percent of what's here relate to global sales; websites in Malaysia, India, Taiwan --

THE COURT:  With respect to the initial 150 to 200 products, how did you determine that those were available for sale in the U.S.?

MR. SIPIORA:  We went online to see if they were actually on sale off the website and to the places they had distributors.  And we looked at those active websites to see if

they actually were selling; that you could buy them.

THE COURT:  So what's the difference between those first group of 150-200 products, and the second group of 650 products in terms of ascertaining place of sale?

MR. SIPIORA:  Because it was in the past.  You go back in time.

THE COURT:  How far back in time?

MR. SIPIORA:  Six years.  And to find out what was on sale -- six year statute; right?  Go back six years in time to see whether something was on sale five years ago --

THE COURT:  You didn't have to do that with respect to the 150 products first identified in the PICs, the accused products?

MR. SIPIORA:  Of the approximately 250 we identified, we went online to find out what was on sale, and we could find that.

THE COURT:  Currently on sale?

MR. SIPIORA:  Currently on sale.

THE COURT:  You didn't have to do any archival work?

MR. SIPIORA:  We did not do archival work.  Was it currently available on the market.

THE COURT:  So that's why -- that's the difference?

MR. SIPIORA:  That's the difference.

THE COURT:  The first group yeah easily ascertainable because you were looking at current information; whereas, the

second group you had to look at archived information?

**MR. SIPIORA:**  In theory, one could have.  But my point is, first of all, it wasn't easy.  It took a long time.  200 products.

But, second, it wouldn't have necessarily found the information.  We looked at -- you look at their websites, the stuff they've cited, 85 percent of what they've cited is foreign or doesn't relate to the United States.

You can look at a lot of things and not find information about whether it's on sale.  You can't go to their website and buy a product.  They don't sell.  It's archival things they provided to us.

**THE COURT:**  What if you had found that some of these products were currently on sale?  Would they be actionable?  Like this archival work EE PC 1005HA, had you found that you could buy it at Best Buy, could you have sued on that?

**MR. SIPIORA:**  Yes, I believe -- yes, I think that's right.

**THE COURT:**  What effort was made to find out, out of that 650, how many of those -- what do you know?  How many of those were currently on sale at the time you moved to amend the PICs?

**MR. SIPIORA:**  None of them were.

**THE COURT:**  None?

**MR. SIPIORA:**  We didn't find any of them.

**THE COURT:**  So these are all past sale items?

**MR. SIPIORA:**  That's correct.  If they had been on sale -- now, could we be perfect and find every single website in the world, potentially in the United States, every seller?  We looked all over the Internet.  We looked diligently to find.  And every one that we found we included; which was about 200.

**THE COURT:**  All right.  Do you disagree factually that of the 650 products they want to add, that none of them were currently on sale at the time of the filing of the motion to amend?

**MR. LEE:**  Yes, Your Honor.

So, first of all, the only insight we have into plaintiff's investigatory efforts based on the evidence that was proffered is that they looked at Wal-Mart's website and Best Buy's website.  And this was just maybe a day or two before filing the original complaint.  And, Your Honor, that is simply not enough to demonstrate diligence.

Furthermore, it is not defendants' burden to show diligence on -- by providing them evidence of that; that all these products were specifically on -- publicly available at the time of serving their PICs.

**THE COURT:**  Right.  So burden of proof -- burden of proof is on the plaintiff in this matter to prove diligence.

**MR. LEE:**  Yes, Your Honor.

**THE COURT:**  And you say that the only evidence of

diligence is that they looked at two websites.

MR. LEE:  Yes, Your Honor.

And, further still, we -- you know, ASUS's website is not -- it's not a foreign website, when Counsel describes the ASUS global website.  And that is still applicable to the U.S. as well as other countries.

Whether it's specifically tied to the U.S., they would have needed to do a little bit more digging, but not too much because in ASUS's website we have -- we have a long list of ASUS's U.S. distributors and retailers, all of which -- most of which have online portals.  So.

They could have done searches that way.  And, again, the use of Google, the use of archive.org could have -- those are just, for our purposes, proving that these -- this publicly available information was available at the time that they served their PICs.

THE COURT:  Let me ask you, what evidence is in the record of diligence?  Is it true that the only evidence is your clients looked at two websites?

MR. SIPIORA:  Those were examples that were given.  We looked at other websites.

We looked at, first of all, ASUS's website, to see what products were out there.  We started with that, and then went from there and looked to see whether sales were available.

So the example we gave was Wal-Mart and Best Buy, I think.

But we looked to see whatever we could find that was on sale -- that was on sale.  There's been no dispute -- I can't hear him disputing that we looked to see what was available on sale at the time.

THE COURT:  Right.  The question is archivally speaking --

MR. SIPIORA:  Right.

THE COURT:  -- what was done?

What specific evidence do you have by declaration or otherwise?  Admissible evidence.  Because you have the burden of proof.  What do you have in the record that shows that you -- that you utilized an archival website or Google or something else to look in the past?  I understand these are not current sales.

MR. SIPIORA:  We made a determination -- the answer directly to your question is we don't have any evidence specifically showing that we looked in the past.  And the reason is this:

We made the determination at the time that we could identify products that were on sale now.  But we could not determine, from what was on the record available at the time, whether things were available for sale in the past.

In this circumstance, there needs to be -- I would submit with that prima facie submission which we've made, and we stated in our papers and in our declaration, there needs to be

some showing by them there would have been an opportunity to obtain this information.  In other words, if we had looked in all these archival sites --

THE COURT:  Why is the burden on them?  The burden is on you.

MR. SIPIORA:  Well, we made the initial statement -- and stand by it -- that there's no reliable way to conclude what all is going to be on sale in the past.  We could find some products potentially.  But the volume of products we're talking about and the issues that we're talking about --

THE COURT:  How do I know that?  How do I know had you not used archive.org, or whatever it's called, or Google, you could not have found proof of past sales in the United States within the limitations period for a lot of these products?  How do I know that?

MR. SIPIORA:  Because they've submitted evidence to that effect.  And it doesn't show it.  The stuff we're looking at, that they're submitting --

THE COURT:  What they submitted isn't adequate for you because it only shows a global website.  That doesn't tell you that you couldn't, by digging a little deeper, by taking it to the next step, couldn't have found it.

MR. SIPIORA:  Well, I respectfully disagree.  They're trying to show that this evidence was available.  And what their evidence actually shows was you can't make determinations

like that very easily.  You can't reliably determine what was on sale and what was not on sale.

There were a lot of products.  And the information that's been provided by them, which is the extent of Exhibits E, I, J, and K, shows the information about products was available.  But the information is general in nature.  And it does not -- as I indicated, often refers to multiple countries, other countries, and so forth.  That's what we were up against when we looked.

**THE COURT:**  All right.  I find that diligence has not been met as required by our local rules, in particular 3-6.  Burden of proof lies with the party seeking to amend.

And most of the courts have found that lack of diligence is dispositive.  It's not like a Rule 15, under the rules of civil procedure, where you have to find prejudice or not.  So I find there has not been diligence.

I, frankly, find it hard to believe in a large high-stakes lawsuit with sophisticated counsel, sophisticated counsel and clients, that one could not find whether a particular product was on the market in the United States over a six-year period.

In any event, Counsel has conceded that there's nothing in the record that shows that a specific undertaking and search was done.  So I have no proof of any real diligence.  And, therefore, I'm going to deny the motion to amend the preliminary infringement contentions.

You can bring another lawsuit, which I assume you'll do.

And then I'll assume they get related here and you'll probably be back here anyway.  But it's not part of this suit.

So what's our next --

MR. SIPIORA:  Thank you, Your Honor.

THE CLERK:  We have a tutorial on April 18.

THE COURT:  All right.  Guess we'll see you then.

MR. SIPIORA:  Thank you.

THE COURT:  Thank you.

MR. LEE:  Thank you, Your Honor.

(At 2:07 p.m. the proceedings were adjourned.)

- - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Monday, January 25, 2016




*Katherine Sullivan*


_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter