1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

HONORABLE DONNA M. RYU, U.S. MAGISTRATE JUDGE

- - -

AVAGO TECHNOLOGIES GENERAL IP         )
(SINGAPORE) PTE. LTD.,                )
                                      )
                    PLAINTIFFS,       )    Case No.
                                      )
          vs.                         )    15-cv-04525-EMC
                                      )
ASUSTEK COMPUTER, INC., ET AL,        )
                                      )
                    DEFENDANTS.       )
_____)


*REPORTER'S TRANSCRIPT OF*
*JOINT DISCOVERY LETTER BRIEF*
*THURSDAY, FEBRUARY 11, 2016*
*OAKLAND, CALIFORNIA*


<u>APPEARANCES:</u>

FOR PLAINTIFFS:    KILPATRICK, TOWNSEND & STOCKTON, LLP
                   Attorneys at Law
                   BY:  Matthew C. Holohan, Esq. (Telephonically)
                   1400 Wewatta Street, Suite 600
                   Denver, Colorado 80202-5556
                   303-571-4000   Fax:  303-571-4321
                   Email:  Mholohan@kilpatricktownsend.com

FOR DEFENDANT:     ALSTON & BIRD, LLP
                   Attorneys at Law
                   BY:  Michael J. Newton, Esq. (Telephonically)
                   2828 North Harwood Street, Suite 1800
                   Dallas, Texas 75201
                   214-922-3423   Fax:  214-922-3863
                   Email:  Mike.newton@alston.com


REPORTED BY:       VICTORIA L. VALINE, CSR 3036, RMR, CRR
                   VictoriaValineCSR@gmail.com


UNITED STATES DISTRICT COURT

*OAKLAND, CALIFORNIA;  THURSDAY, FEBRUARY 11, 2016*

*11:45 A.M.*

– – –

THE CLERK:  Calling civil case 15-cv-4525-EMC, Avago Technologies General IP (Singapore) versus ASUSTeK Computer, Inc.

All counsel please state your appearances.

MR. HOLOHAN:  This is Matthew Holohan from Kilpatrick, Townsend and Stockton for plaintiff.

MR. NEWTON:  Michael Newton from Alston and Bird for defendants ASUS.

THE COURT:  Good morning to you both.

MR. NEWTON:  Good morning.

THE COURT:  I'm just going to take this from the top. The first dispute has to do with interrogatory number 2.

MR. NEWTON:  Correct, your Honor.

MR. HOLOHAN:  Yes, your Honor.  And I think the dispute on that relates to worldwide sales versus domestic sales only.

THE COURT:  Right.  I've got a question for you, Mr. Holohan.

Why is Avago seeking information about worldwide sales? Why is that relevant?

MR. HOLOHAN:  Well, there are a variety of reasons that worldwide sales could be relevant to the ultimate

determination of damages.

As we understand the discovery that has been produced, only discovery regarding the transactions involving the U.S. entity have been produced.  So as an initial matter, it seems like we're being asked to take on faith that all of the direct U.S. sales involving either defendant come through the U.S. entity, and the sales data from the Taiwan entity would help us verify that and challenge it if need be.

Also, we do have inducement claims in this case, and it's possible that there are -- that there are worldwide sales that involve U.S. inducement activity that ultimately end up coming into the U.S. through other channels, and we would be entitled to review and analyze that information as well.

THE COURT:  Okay.  You didn't explain in your letter what the relevance was.

With respect to damages, it seems like the basic question is whether or not ASUSTeK or the defendants made, used, sold, or imported accused products into the United States.  And to the extent that any accused products fit one of those verbs, then discovery would be appropriate under the *Carnegie-Mellon* case, but if there's an accused product for which defendants did none of those things in the United States, then that information would not be subject to discovery.

So I'm not sure whether the parties have fully either met and conferred, or -- if your concern, Mr. Holohan, is that you

have to take counsel's word at this, then you can structure some written discovery to nail that down.

MR. HOLOHAN:  I understand that, your Honor.  But like I said, we also have inducement claims, and there could be foreign sales with a company in the U.S. based inducing activities that lead to the importation or sale by third parties into the U.S., and the original sales outside the U.S. may be happening by the Taiwan entity or the U.S. entity.

THE COURT:  So run that down for me, because, as I said, this is not in your letter brief.  So give me a concrete example of what -- of the kind of activity that you think would trigger the discovery that you're looking for.

MR. HOLOHAN:  Well, for example, the Taiwan entity could sell a product to some foreign third party and then engage in -- either the U.S. entity or the Taiwan entity could engage in activities in the U.S., communications of that third party of -- a variety of possible formats, either promotion, encouragement, you know, the usual activity that go to inducement.  That third party can then sell or import the product into the U.S.  In that case, the third party would be the direct infringer and defendants would be liable for inducing that infringement, but the original sale would take place outside the U.S.

THE COURT:  Is there any evidence of that?

MR. HOLOHAN:  At this stage in discovery we haven't

seen evidence of that, but that's what we're -- you know, it's certainly plausible given the way these supply chains work, and given the way the global nature of this industry works that that would occur.

THE COURT:  Do you have an allegation of that in your complaint?

MR. HOLOHAN:  We have a general allegation of induced infringement for all seven patents, your Honor.

THE COURT:  A general one?

MR. HOLOHAN:  Yes.

THE COURT:  Anything else on this, Mr. Holohan?

MR. HOLOHAN:  No, your Honor.

THE COURT:  Mr. Newton?

MR. NEWTON:  Yes.  This is Mike Newton for the defendants.

Your Honor, we did have meet and confers on this issue way back.  We did tell them we would go back and talk to both of our clients and see if there's any -- any evidence at all that we sell to somebody outside the country knowing they're going to import or bring products in the country.  Based on everything we've looked into now, we have absolutely no evidence of that.

We've put it in interrogatories that that is our understanding and that that does not happen.  Then they've done a lot of discovery to third parties, people we sell to, for

example Best Buy or Microelectronics, Inc., and in every instance the sales documents and the purchase orders show that the products are being sold to them through the U.S. subsidiary, ACI, and there's a -- absolutely no evidence in the record that we sell to somebody outside the country with any kind of knowledge that it's coming into the country.  It's just not the way the company is set up.

     If we did find evidence of that and we take depositions and we find a document, we would certainly follow-up on that.  But based on what we know today, there's just nothing to support that.

     So giving them all our worldwide sales information on this hunch that we may have done this inducement activity is really fishing, if you will.

          THE COURT:  Okay.  So putting aside the inducement argument, Mr. Newton, are you saying that your client is prepared or already gave interrogatory responses saying that you're providing the information on sales with respect to accused products made, used, sold, or imported into the U.S.?

          MR. NEWTON:  Yes.  I'm saying that.

          THE COURT:  Okay.  Are you also representing to Avago in a written discovery response that ASUSTeK does not make, use, sell, or import accused products in the United States except through ACI?

          MR. NEWTON:  That's correct.

UNITED STATES DISTRICT COURT

THE COURT:  Have you already done that?

MR. NEWTON:  Yes, we have done that.

Then we've given them the sales information -- the intercompany transfer records that show how -- from an intercompany standpoint, we show how products are transferred from ASUSTeK to ACI -- the U.S. sub -- and what money we attributed to that, and then we show the sales from ACI, the U.S. sub, to a third party in the country.  So we've given them that type of information.

THE COURT:  And that's in a verified interrogatory response?

MR. NEWTON:  In a verified interrogatory response, and then as part of that, I think Excel spreadsheets that track those sales and the numbers.

THE COURT:  Okay.  Given those representations, I'm not going to order further sales information on the damages theory at this time.

So if that changes, then it's possible, Mr. Holohan, that your client would have a right to broader discovery on that.

As to the inducement theory, I'm not hearing anything other than a general claim, so there isn't -- I would want to see more before I ordered further discovery on that.  It does not sound proportional at this time.

So, in other words, the burden of producing that information is not -- it doesn't make sense in light of the

fact that there isn't any evidence that would support an inducement theory that you suggested at this time. But obviously if that changes, you can renew your request.

MR. HOLOHAN: Thank you, your Honor.

THE COURT: Okay. Let's turn to interrogatory number 3. This is the Qualcomm source code information. Mr. Newton, what have you found out about that?

MR. NEWTON: So, your Honor, Avago finally sent a subpoena directly to San Diego, which I think Qualcomm had requested. I finally got a call from counsel for Qualcomm, Mr. Kays -- which is K-A-Y-S -- and we talked things through. He told me he did not believe that they had given source code on the products at issue to ASUS.

He then asked me if we could provide him with information that would help them, you know, honor their obligations under the subpoena, and the information they need from us is what are the so-called build IDs for the products we made. So if you just know the product name, you may not know what source code is needed, you need this additional information called build IDs. He asked for that, I think, early last week.

I immediately called my client and said can you get this for me, or can you talk to your third party suppliers and get that? He said he would, but the Chinese New Year was beginning, and he wouldn't be back to work until February 15th.

So I don't know where that stands, but we have -- I told

Mr. Holohan and Avago that we would work to get the build IDs if that information is in our possession, custody or control, or if we can ask one of our third party suppliers to supply that.

Just one thing for the record is, ASUS doesn't have fab facilities. They have products made by third parties. So they go to a company like Foxconn who makes computers for Dell, and Apple, and everybody else, and they have them design the ASUS computer and actually build it.

In addition, there may be third parties who supply components like Qualcomm or even another company called Novatel, where Qualcomm will give a chip to Novatel. Novatel will build a module. That module will then go to this fabrication company and it will get put in. But to the extent we have ability to find what the build IDs are, we intend to get that to Qualcomm and Avago in as rapid a manner as we can.

I've historically litigated with and against Qualcomm for probably 15 years. Finding the build IDs, in my experience, isn't always as easy as it sounds. So I know Mr. Holohan would like to ask me to do it in 15 days. I'm going to do my very best to get it to him in as quick a manner as possible, but 15 days may not be doable.

THE COURT: What is doable?

MR. NEWTON: To tell you the truth, your Honor, I don't know because I don't know how the components are

supplied.  If it's directly from one of our fab companies and they know right offhand, then I think it's doable within a month.  If it has to then go, instead of that way to a third party, I'm not sure.  And I also don't know how many build IDs there could be per product.  There may be -- you know, it may change from, you know, one year to another year to another year, and I've just got to figure that out.

So I will endeavor to do it within 30 days.  I'm happy to commit to that, but it's going to be just a good faith effort, because I don't know what I don't know.

THE COURT:  Okay.  So to recap, before I hear from Mr. Holohan.  I think you're saying, Mr. Newton, that your client does not have access to the Qualcomm source code, but that --

MR. NEWTON:  Correct.

THE COURT:  -- you have information that Qualcomm needs in order to respond to the subpoena, and you are representing that you'll make best efforts to get that information a Qualcomm, can we say on a rolling basis within 30 days?

MR. NEWTON:  Absolutely.  Yes.

THE COURT:  Okay.  Mr. Holohan, what is your response?

MR. HOLOHAN:  Your Honor, that all sounds fine.  I'm going to accept the representation from Mr. Newton that, you know, he'll do this as quickly as possible and within the

30-day benchmark.

I just wanted to clarify a couple of things for the record. Mr. Newton said we finally served the subpoena.  The original subpoena on Qualcomm was served back in May, and we've been engaging in extensive negotiations with them.  And we were actually told rather explicitly by Qualcomm's counsel that ASUS had access to the source code.  So Qualcomm's counsel changed their story on that.  I just didn't want it to appear as though that was something we made up or we mischaracterized anything.

Apart from those clarifications, as I said, I mean, if Asus is undertaking and committing to get that information if possible to Qualcomm, then we can live with that.

THE COURT:  Okay.  So let's move on to the next dispute, which is interrogatory number 4.

MR. NEWTON:  Yes, your Honor.  I think we've reached agreement on interrogatory number 4, so we can let that one go.

THE COURT:  Okay.  Let's turn to the last dispute, which has to do with Avago's request for all settlement and license agreements related to the accused product.

Have you made any headway on that?

MR. HOLOHAN:  I don't believe so, your Honor.  I think we are -- Avago's position is still, given the breadth of the technology at issue in this litigation, that any settlement agreement or license agreement implicating the accused products would be at least reasonably calculated to lead to admissible

UNITED STATES DISTRICT COURT

evidence.

I know that ASUS has cited some case law regarding the sort of ultimate admissibility and propriety of, you know, relying on, quote, radically different license agreements to form a damages theory or analyze the *Georgia Pacific* factors.  I think as an initial matter we're very far away from that.  We're just in discovery here.

The determination of what license agreements are ultimately acceptable for an expert is something we'll deal with in the *Daubert* context.

In addition, you know, we're not looking for anything radically different.  We're looking for license agreements that involve the accused products.  And our contentions reach a lot of different parts of the products.  So I don't think it's unreasonable to go beyond that and just evaluate license agreements related to the products themselves.

THE COURT:  Mr. Newton?

MR. NEWTON:  Yes.  This is Mike Newton again for ASUS.

Your Honor, a computer has just unbelievable amounts of patented technology.  It's not an overstatement by any in stretch to say there's over a thousand patented components and different patents.  Because of this there's a large number of license agreements, both patent and technology license agreements, that relate to the accused products.  And to have to go through and produce every one and, you know, write to the

third parties and seek, you know, their agreement that we could produce it or give them notice, depending on what various agreements require, is extremely burdensome.

If you'll indulge me for a moment, you know, in the 2009 time frame and before then, the typical case was oh, just produce every license agreement, and you get into the damages discussion and, you know, they put up a computer costs a thousand bucks, you made a billion dollars, a dollar is reasonable. And at some point the Apples, and the Googles, and the Dells, and the HPs of the world said enough is enough. We're sued fifty times a year. We get this in every case. They put a lot of pressure on Congress to change the patent laws.

Before Congress did anything, the courts kind of said, you know what, we're going to shore this up. So starting in 2009, I think, Chief Judge Rader of the federal circuit sat by designation in a case in New York called Cornell versus HP. And he said, you know what, there's a doctrine called the entire market value rule and it says you've got to value these things based on what patented technology is being used not, you know, what the accused product is. So you have to go through that in apportionment.

And since then there's been a lot of case law coming out of the federal circuit. I think the case that we cited was the --

THE COURT: Lucent --

UNITED STATES DISTRICT COURT

MR. NEWTON:  -- *Lucent vs. Gateway*, but there's *Unilock,* and there's *Laser Dynamics*, and it's pretty clear now that no expert can rely on just a general license agreement to an accused product that has nothing to do with the technology that's at issue.  And it's really a safeguard to ensure that, you know, the damages are run in a proper way.

So they're going to require us to produce all this, and no expert can possibly rely on it.  There's been a lot of *Daubert* motion practice in the last six or seven years and, you know, we end up, in some cases, having to produce all this and it's just not relied on.  And it's really -- from my client's standpoint, it's a waste of time and money for our lawyers to have to go through, review every agreement, you know, go through the rigamarole to say what's the agreement we have with the third party whose agreement we want to produce?  Try to figure out what kind of notice we have to give, to whom we have to give it, write the letter, and produce the documents.

It's a colossal -- it's just a waste of everybody's time and energy.

THE COURT:  Mr. Holohan, anything further?

MR. HOLOHAN:  Well, your Honor, I -- I would just say that obviously I don't have visibility into the -- how many license agreements there are and what the burden is.  The details of that were not laid out in the letter, but as I said, Mr. Newton is arguing the ultimate merits of the admissibility

and the propriety of these license agreements and saying there's no way they could possibly be relied upon.  We're months away from that analysis.

At this point we're entitled to view documents, have our experts look at them, and have the expert make the initial determination as to what -- what is going to reveal the value of these patents and form the hypothetical negotiation.

THE COURT:  So the other thing that's changed are the Federal Rules.  We're no longer in a place where the courts look at the request and say well, just give them everything and we'll sort it out.

I think the request is over broad.  I think that where the parties need to do a little more work is in meeting and conferring on what it means to be related to the accused technology, because that does seem to be key.  And I don't know, Mr. Newton, whether Mr. Holohan currently agrees with the scope that you are drawing around that particular worth, but if the -- you know, the technology is very broad here, and I don't have enough information before me in this joint letter to have -- you know, to understand that very well, then it might bring more settlement and license agreements into the scope of discovery if it's pretty well defined, then that makes the job easier.  But I -- I want the parties to have one more talk about that.

So in other words, Mr. Holohan, I'm not going to order

that -- that ASUSTeK just produce everything at this time, but I am going to take a harder look -- if you're not able to come to agreement, take a harder look at what would be encompassed by agreements relating to the accused technology.

So why don't you meet and confer. If you can't come to an agreement, please queue up a joint letter that's solely on that topic where you can give me a little more information about the technology at issue, and what you think each thing should fall within or without that limitation.

What's a reasonable time? Shall I give you two weeks to file that letter?

MR. HOLOHAN: That should be fine with me.

MR. NEWTON: That's fine with ASUS. This is Mike Newton.

THE COURT: Okay. So I've made rulings as to the other disputes that you haven't already agreed on. So as to this one it's simply that you need to meet and confer further about the scope of what is the technology related to the accused product and queue up another dispute if you can't come to agreement.

Is there anything further?

MR. NEWTON: Yes. On that point, your Honor, I mean, I assume discovery would go both ways. I know Avago has a huge licensing program and I don't think we've asked for broad discovery. They've also recently merged with Broadcom, who's a

UNITED STATES DISTRICT COURT

big player in the technology space, and I don't think we've asked them for all their documents, but I assume things would go both ways in whatever scope we agree to.

THE COURT:  Do you agree, Mr. Holohan?

MR. HOLOHAN:  Your Honor, I'm hearing this for the first time, so I'm not sure.  I don't know what he means by that.

So I -- I'd have to consider that, but it's something we can meet and confer on if necessary.

THE COURT:  Okay.  Well, wrap that into the conversation then.

MR. NEWTON:  Okay.

THE COURT:  Okay?

MR. NEWTON:  Nothing further.  Thank you, your Honor, for accommodating us on the phone.

THE COURT:  Sure thing.

MR. NEWTON:  My daughter was appreciative.  I will be around to help her with her geometry homework.

THE COURT:  All right.  Thank you both.

MR. NEWTON:  Yep.  Thanks.  Bye.

(Whereupon the matter concluded at 12:07 p.m.)

--o0o--

UNITED STATES DISTRICT COURT

CERTIFICATE OF REPORTER


        I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.



_____

            Victoria L. Valine, CSR 3036, RMR, CRR

                THURSDAY, FEBRUARY 18, 2016


UNITED STATES DISTRICT COURT