**Pages 1 - 106**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

AVAGO TECHNOLOGIES GENERAL IP  )
(SINGAPORE) PTE LTD.,          )
                               )
          Plaintiff,           )
                               )   **NO. C 15-04525 EMC**
   VS.                         )
                               )
ASUSTEK COMPUTER, INC.; ASUS   )
COMPUTER INTERNATIONAL; and    )
DAVID KEYZER,                  )
                               )
          Defendants.          )
_____)

San Francisco, California
Monday, May 9, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
            KILPATRICK, TOWNSEND & STOCKTON LLP
            1400 Wewatta Street - Suite 600
            Denver, Coorado  80202
       BY:  **DAVID E. SIPIORA, ATTORNEY AT LAW**
            **KRISTOPHER L. REED, ATTORNEY AT LAW**
            **MATTHEW C. HOLOHAN, ATTORNEY AT LAW**
            **JEFFREY M. CONNOR, ATTORNEY AT LAW**

For Defendants:
            ALSTON & BIRD LLP
            2828 North Harwood Street - Suite 1800
            Dallas, Texas  75201
       BY:  **MICHAEL J. NEWTON, ATTORNEY AT LAW**
            **SANG (MICHAEL) LEE, ATTORNEY AT LAW**
            **DEREK NEILSON, ATTORNEY AT LAW**

Reported By:   Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
               Official Reporter

**Monday - May 9, 2016**                                    **1:08 p.m.**

**P R O C E E D I N G S**

**---000---**

THE CLERK:  Calling case C 15-4525, Avago versus ASUSTek.

Counsel, please come to the podium and say your name for the record.

MR. SIPIORA:  Good afternoon, Your Honor.  David Sipiora from Kilpatrick Townsend.  We represent plaintiff Avago Technologies.  With me is Kris Reed --

MR. REED:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. SIPIORA:  -- Matthew Holohan --

MR. HOLOHAN:  Good afternoon, Your Honor.

MR. SIPIORA:  -- and Jeffrey Connor.

THE COURT:  Thank you.  Good afternoon.

MR. NEWTON:  Good afternoon, Your Honor.  Michael Newton from Alston Bird for the ASUS defendants.  And with me is Sang (Michael) Lee --

MR. LEE:  Good afternoon.

THE COURT:  Good afternoon.

MR. NEWTON:  -- and Derek Neilson.

THE COURT:  Great.  Thank you.

Okay.  We're on for claim construction, and I don't know if you-all have agreed on a particular order or way to proceed,

but I'll hear you out on that.

MR. SIPIORA: We have. With your approval, we had agreed to present in the sequence that our materials reflect, that the '663 patent first, then the '148, '835, '730, and '830.

THE COURT: Okay.

MR. SIPIORA: And we hadn't specifically talked about how we'd do this, but the thought would be -- at least our thought would be to present the term first, and then the other side on that same term, and go through term by term with respect to each patent till we completed the patent, then go to the next patent.

THE COURT: Yeah, that's fine. We may need to spend more time on some than others, but we do need to get done today. I'm not going to carry this over.

MR. SIPIORA: You're not going to?

THE COURT: We're not going to carry it over. We're going to complete it today.

MR. SIPIORA: All right.

THE COURT: So bear that in mind with -- are there nine terms? You know, you can figure out about how much time we have. It's not unlimited, so...

MR. SIPIORA: And what's our stop time today?

THE COURT: Our stop time is at 4:00 o'clock.

MR. SIPIORA: 4:00 o'clock. Okay. And we have the

CMC also.

**THE COURT:** No, I made it clear we're not coming back tomorrow. Today is it.

And we need time -- so really 3:30 is when I had set, I think, the -- so I prefer to finish at 3:30.

**MR. SIPIORA:** Right. The CMC, I'll tell you -- unless Mr. Newton has a different view -- the CMC will be very brief. We've agreed on everything in substance, and just your approval needed for the dates, I believe.

**THE COURT:** Okay.

**MR. SIPIORA:** We have one open issue just in terms of their desire potentially to have claim construction. Potentially.

**THE COURT:** Well, okay. Then, I mean, we can handle that closer to the 4:00 o'clock hour, but we need to be done by 4:00.

**MR. SIPIORA:** Understood.

**THE COURT:** Okay.

**MR. SIPIORA:** All right. Thank you.

**THE COURT:** All right. You may proceed.

**MR. SIPIORA:** All right. Mr. Reed will present first on the '663, Your Honor.

**MR. REED:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

**MR. REED:** Kristopher Reed on behalf of plaintiff

Avago.

Your Honor, there were three terms briefed in the initial -- our initial brief.  In ASUS' responsive brief, they have agreed that one term does not need construction, so we're only looking at two issues as it pertains to the '663.

This first term, which is currently on the screen, "setting said index value to a threshold," and then there's an ordering dispute that we'll talk about next, but the second term is no longer in dispute.

**THE COURT:**  Great.  Thank you.

**MR. REED:**  Turning to the first term, "setting said index value to a threshold," these specific terms -- this specific language is found in Claim 1 and Claim 11 of the '663. However, if you look at the proposed constructions for both parties, you'll see that the only term or subterm that's actually construed by the other party is that term "threshold." And that's important because in construing the term "threshold," we need to take some care because it has implications beyond Claim 1 and Claim 11 and has implications in Claims 12 and 21, the encoding claims, which also use that same claim term "threshold."

Now, I think we'll hear from ASUS that they'll want to limit it to Claims 1 and 11 because their construction term elements of it don't make sense in the context of 12 and 21, but we'll get to that in a moment.

As it pertains to the word "threshold," as is used in Claims 1, 11, 12, and 21, there is no departure from its plain and ordinary meaning.  Now, we have provided the Court with a dictionary definition, extrinsic evidence, not to set forth the meaning but to corroborate exactly how it's used in the '663 patent itself.

The extrinsic evidence confirms the plain and ordinary meaning is a point beyond which there is a change in the manner a program executes, and that's precisely how it's used in the specification of the '663 patent.  You see that N is the threshold -- let N be the threshold at which unary to exponential Golomb switching occurs.  That is a point where the program, either the encoding or the decoding, switches in its operation and consistent with the plain and ordinary meaning in the industry and consistent with that proposed by Avago for the construction of this particular term.

Turning to ASUS' proposed construction, you'll see that that proposed construction, that construction, "an initial predetermined number," is limited.  Its primary problem is the fact that it loses this essential meaning of what is or is not a threshold.

Now, that is absent in ASUS' proposed construction. Nothing in the construction proposed by ASUS captures the concept that something changes in either the circuit or the program or the method when you go beyond the threshold.

Not only that, this particular construction, ASUS' construction, compounds this problem, compounds this absence by adding unnecessary and what we term confusing words "initial" and "predetermined."

Starting with "predetermined," ASUS proposes we introduce the term "predetermined" in the construction of what is effectively "threshold," but that's ambiguous.  What is it predetermined as to?  What is the event or feature to which the threshold is predetermined?

Now, if ASUS simply means that the threshold is known in advance of the coding or that the threshold is known in advance of decoding, then adding this word really provides no clarity.

Now, the remainder of the claim makes clear that the threshold is known prior to encoding or decoding a particular syntax element.  It's not adding any clarity.  All it's adding, then, is potential confusion to the finder of fact having to wrestle with this additional 13-letter word, which has no anchor, has no description as to what it is predetermined as to.

THE COURT:  Well, is there a predetermined number?

MR. REED:  There is, Your Honor, with respect to -- in the sense that it's predetermined in advance of encoding or decoding --

THE COURT:  Right.

MR. REED:  -- but not in advance -- if they're saying

that the threshold has to be constant for all syntax value types.  And that's our argument, Your Honor.

THE COURT:  It actually doesn't say that. "Predetermined" does mean it's predetermined in advance.  I mean, it's not literally wrong, is it?

MR. REED:  It's not literally wrong, Your Honor. That's why I say, if that's what it means, if it means that it's known in advance of encoding or decoding; but basically now we're performing a construction of a construction, and our concern is that that's going to introduce confusion to the trier of fact, and also afraid that what they're going to do is argue that somehow "threshold" -- excuse me -- "predetermined" not only means in advance of encoding or decoding but also means predetermined in that it's static; it has to be the same value, the same constant for all syntax element values, which is just not accurate in light of the specification.

The specification makes clear that for a given syntax element, that threshold can change, can be different.  Whether we're talking about motion picture differences or other differentials -- intraframe, interframe -- you can have different thresholds.  The specification itself gives two different examples, a threshold of 64 and a threshold of 14, in Figures 5 and 6.

So if all we're saying is it's known in advance of coding and decoding, why put it in the construction?  Because the rest

of the claim language from Claim 1, Claim 11, Claim 12, Claim 21, the rest of the language makes that clear.  So all you're doing is introducing confusion putting in this --

THE COURT:  So in Claim 1 you say it's clear that it's already -- it's a known number in advance?  Where do I discern that?

MR. REED:  I'll turn to Claim 1 here.  You see the word "threshold" makes its appearance in element (A) in Claim 1.

THE COURT:  Yeah.

MR. REED:  "Setting said index value to a threshold in response to a first portion of said codeword having a first pattern."

Now, it's understood that if you're setting it to a threshold, that threshold has to be extant.  You know, it has to exist in order to set it to that threshold at that point in a particular method.

And so then saying it's predetermined, we submit only introduces ambiguity in the sense that it's predetermined to mean more than just the fact that it's known in advance.  If that's what they're advocating, it introduces confusion and it contradicts the specification.  If that's all they're asking for, then why put it in?  It just adds ambiguity.

THE COURT:  Why don't we stop right there instead of -- I'd like the response to that -- to this argument that

"threshold" already implies that it's an existent extant number and to add the word "predetermined" just confuses -- is confusing.  What's your response to that?

        **MR. LEE:**  Good afternoon, Your Honor.  This is Michael Lee for the ASUS defendants.

    We have slides prepared for this, but basically we disagree that "predetermined" has any ambiguity.  It seemed -- and we also don't dispute the fact that threshold can be different for different syntax elements.

    I think one aspect of why "predetermined" is not ambiguous is because "threshold" in itself does not necessarily connote that it's known in advance.  You can have thresholds where -- that are not known in advance, such as some sort of chemical reaction thresholds that you don't know in advance what that changing point is.

    So I think "predetermined" definitely adds value there, and it's also not -- it's also not -- sorry.  Sorry.  One second, Your Honor.

        **THE COURT:**  Your point is thresholds don't have to be predetermined; you can have thresholds that are not known in advance?

        **MR. LEE:**  That's right, Your Honor.

        **THE COURT:**  So it adds something.

        **MR. LEE:**  It certainly adds something, Your Honor.

        **THE COURT:**  And you think it doesn't imply a constant

static number?

**MR. LEE:**  No.  And I think that's something that was determined in the *Barnes & Noble* case where, Your Honor, you construed it as a predetermined number, not a predetermined constant.  And that was substantially argued by the parties, especially on LSI, the predecessor in interest, their part they were adamant that this number was not a constant.

*Barnes & Noble* made clear that that's not what they're trying to do either.  So same thing here, ASUS' position is just trying to preserve and uphold the sound construction that this Court made in that case.

**THE COURT:**  Let me get your response that, that there is some value because you can have a nonpredetermined threshold in certain situations.

**MR. REED:**  Your Honor, perhaps in certain chemical situations, maybe that's correct but this is not that situation.

Our point is that the context of where threshold is used in Claim 1 tells you that already.  All right?  It tells you that when you're setting the index value to a threshold, it's telling you that that threshold is extant; and adding this term "predetermined," a term with which the finder of fact, the jury, is likely to be one unfamiliar, only introduces confusion beyond what is already said in the claim language itself.

We're not talking about construing "threshold" in the

abstract as Mr. Lee has suggested here where in certain instances or certain contexts "threshold" maybe need to have "predetermined" to make it understood.  It's understood without the word.  The word is at best superfluous and most likely confusing, and we just don't need it in the construction of "threshold."

**THE COURT:**  Okay.  Let's go to the next point you want to make about the "initial."  Is that --

**MR. REED:**  The next point is "initial," Your Honor, and this is where we bring in the other claims, the encoding claims, as well as the decoding claims, with respect to initial.

Again, we're talking about initial -- they want the threshold to be an initial number.  Again, this implies some temporal sequence.  But when you're talking about the encoding claims, Claims 12 and 21 in particular where that term is used, there's no context, there's no basis for saying it's initial in any sense.  It just talks about it's being used slowly.

And its only purpose in those claims, its only possible effect in those claims is as an inflection point between the generation of the first pattern and moving over to the generation of the second and third patterns.  There is nothing anywhere in those claims or in the description or the specification which would raise the need or inference that it's an initial number in any sense.

And so by construing "threshold" by saying "initial" in one claim but not "initial" in a different claim, we're introducing a lot of confusion to the trier of fact trying to understand:  Okay.  Why is it "initial" here, or why does it mean something different in Claim 12?  We don't need -- it doesn't add anything, it's confusing, and it's inaccurate. Again, "initial" is not needed.

THE COURT:  Well, the term that we're talking about doesn't appear in Claim 12; right?

MR. REED:  Your Honor, it does appear in -- the entire term does not appear in Claim 12 in terms of the entire phrase; but as you've seen in the parties' construction, the only word, the only word that's being construed is "threshold."  The rest of the language is coming over verbatim from those phrases.

So those phrases are set forth as what's being construed. All the Court is being asked to construe is "threshold"; and if you construe that in one context one way and have it mean something else or it doesn't make sense in a different context, that's going to confuse the jury.  It's not going to clarify.

THE COURT:  All right.  What's your response to that?

MR. LEE:  Your Honor, I just want to emphasize that the term here is the full term, Your Honor, "setting a threshold" -- "setting an index value to a threshold" affecting just Claims 1 and 11.

The only portion of "threshold" that we believe carries

into Claims 12 and 21 is the word "predetermined."  The word "initial," the qualifier "initial," is really just for Claims 1 and 11 where specifically this said index value undergoes change.

And, again, Your Honor, this is something that was fully addressed in the *Barnes & Noble* case where it was actually LSI's position that was adamant that this is an initial number that undergoes change from steps (A) through (C).

**THE COURT:**  But it is true that if one looked at the proposed construction, it's of the term "setting an index value to a threshold means setting an index value to," and it seems interchangeable that the term "threshold" is interchangeable with, quote, "initial predetermined number," according to your proposal.

And so it would be easy for a finder of fact to look at Claim 12 and say, "Well, 'threshold,' I mean, that's what it meant in 1.  Why would it mean something different here; i.e., an initial predetermined number?"

**MR. LEE:**  Well, Your Honor, it's still ASUS' position that it works for Claims 1 and 11.  If the Court were to be able to ascribe a clarification that that definition, that construction should not be ascribed to Claims 12 and 21, I believe that would dispel the confusion.

**THE COURT:**  So you mean the instruction would say expressly that this construction applies only to Claims 1 and

11?

**MR. LEE:**  Yes, Your Honor.  Just we really do believe that it's a helpful construction in terms of understanding the process, the method that is claimed in Claims 1 and 11.

**THE COURT:**  I'm just wondering whether that would generate even more confusion because then how do you define "threshold" in 12, Claim 12?

**MR. LEE:**  Your Honor, one way to do it is just to not construe it other than to this limitation that you may include in the jury instructions; but, alternatively, we would want the construction "predetermined number," which helps, again, the jury understand that this is a number that was deliberately chosen beforehand, not just some sort of arbitrary changing point.

**THE COURT:**  So, if anything, you would possibly delete "initial" just to a "predetermined number" --

**MR. LEE:**  Yes, Your Honor.

**THE COURT:**  -- in order to prevent the problems with respect to Claim 12?

**MR. LEE:**  Yes, Your Honor.

**THE COURT:**  Your response is that that also is too confusing, the "predetermined" implies fixed, static?

**MR. REED:**  That's exactly right, Your Honor.  As I already discussed, there's no reason to add "predetermined" to Claim 11.  To the extent it's predetermined, it's already clear

from the claim language.  There's no reason to introduce again this unfamiliar word to the finder of fact, which is only going to introduce ambiguity and confusion.

THE COURT:  All right.  Let's go on to the second issue with respect to this patent, which is the order performance.

MR. REED:  That's right.  Your Honor, the question is whether the steps -- and I put "steps" in quotes in this slide for a reason.  They say, "Steps must be performed in an order." This is ASUS' issue they raised.

And the threshold issue we really -- sorry to use that term "threshold" -- but the initial issue to use is this concept of steps.  You know, steps are method claims.  System claims don't have steps, yet they're asking the Court to somehow construe system claims, system claims that are composed of circuits configured to have certain features to add steps and then to graft in bodies of case law that apply strictly to method claims into the system claim concept, and the case law has kept those two arenas separate and for good reason.

When we're talking about a method, you're talking about potentially some order in steps.  When you're talking about a system, when it's translated to hardware, in this case a circuit configured to have certain features, it's difficult to understand how that would translate.  Are you talking about transistors in a particular configuration?  Are you talking

about circuits that are designed in a certain way?

It just does not translate in that context as opposed to a method claim where you do have potentially steps.  The question is only:  Are they to be performed in order?

Now, there is one case, Your Honor, where Judge Walker in this district, you know, chose to bring in some of these principles of ordering into a system claim, but that was an unusual circumstance, I submit, Your Honor, where you had a CPU executing a particular control code.  When you have control code executing on a computer, that looks more like system steps.

**THE COURT:**  There are other District Court cases, too.  I mean, maybe not in this district, but other districts have said at least it's permissible in some instances to have a sequential ordering even in a systems claim.

**MR. REED:**  Your Honor, we submit that this is not such a claim.  We're talking about circuit.  And for the reasons we'll discuss with respect to Claim 1 and Claim 12, even if one were to make that approach, it doesn't matter because these particular claims don't have language which implies a temporal sequence, which Judge Walker found in that one case in this district that there was specific language, express language, that implied a temporal sequence.  We don't have that language in these claims.

Even if you were to make that leap and bring in -- somehow

bring in method principles into system claims -- which again, Your Honor, we found no Federal Circuit precedent for it, we found no one actually cited Judge Walker's case for this or any other principle, and we feel it is inappropriate *per se* to bring in those methodologies; but even if you do, it doesn't matter because there's no express language implying a temporal sequence.

THE COURT:  So with respect to Claim 12, you say there's nothing there that suggests ordering or sequence?

MR. REED:  A temporal sequence.

THE COURT:  A temporal sequence.  So when 12(B) and (C) talk about generating a second pattern, a second portion of said codeword following said first portion, that's not a temporal sequencing?

MR. REED:  That's exactly right, Your Honor.  That is a positional sequencing.  It's akin to a puzzle, and that's the analogy we use.  In a puzzle, you'd have puzzle pieces that are positionally sequenced.  When you put in the puzzle pieces, you have different pieces that follow other pieces in that puzzle; however, when constructing that puzzle, there's no requirement, there's no necessity of putting those pieces in that positional order in a particular temporal sequence.

And that's exactly what we find in Claim 12.  You have a codeword being constructed, and that codeword has to have the first pattern, has to have a second pattern, it has to have a

third pattern, and those patterns have to be in a positional sequence.  The second pattern has to follow the first pattern in the codeword, but there's nothing in Claim 12 that requires that those patterns be created and be inserted in that codeword in a particular order.

They can be constructed -- you can build your codeword using the third pattern first, then the first, then the second. The default under Federal Circuit law, unless there's specific language saying it has to have a temporal sequence -- not a positional sequence, a temporal sequence -- is that no order is implied.  That's exactly what we find.

THE COURT:  Can you determine the second portion prior to determining the first portion?

MR. REED:  Yes, Your Honor.  What you're talking about is going from a syntax element, a decimal number, to a binary sequence, a binary sequence composed of three different patterns.

But because you know the entire decimal number in advance, you can compose an algorithm that assesses that decimal number, creates first the second pattern, then the third pattern, then the first pattern, or the third pattern and the second and the first pattern, constructs the binary codeword in that fashion, and then uses that binary codeword for the -- ultimately to transmit as compressed video.

THE COURT:  So the second pattern or the third pattern

is not like a residual or residuary?  It can be determined in advance of the first pattern?

**MR. REED:**  That's correct, Your Honor.  If you know the decimal, the syntax element value, which presumptively you do because you're turning -- in binarization, you're taking the syntax element and doing binarization of that syntax element, it is possible to calculate the second pattern prior to the first pattern or construct the second -- or even calculate the first pattern and then the second pattern but actually insert the bits or the pattern into the codeword in advance.

**THE COURT:**  All right.  Let me ask for the other view about whether you disagree with that as a matter of fact or mathematics.

**MR. LEE:**  Can we get our slides?

(Pause in proceedings.)

**MR. LEE:**  Okay.  So, Your Honor, if I may just kind of backtrack a little bit just to make our point clear starting from Slide 14.

**THE COURT:**  Okay.

**MR. LEE:**  So, Your Honor, the claims of Claim 1 and Claim 12 within the claim language in itself sets out an explicit and/or implicit order.  As you can see here, if you have -- we have step (A) in Claim 1 and step (A) in Claim 12, which are generally -- which can be seen as mirror images of each other.  You are in Claim 12 generating a first pattern in

a first portion of said codeword, and you go on to step (B), step (C).

Just to illustrate this a little better in Slide 14 -- sorry, Your Honor.

Just another initial statement that we wanted to make, that in Avago's briefing, they made no argument regarding the order of Claim 12, saying that it is immaterial to the infringement issue.  So in that respect, Your Honor, we believe that Avago should be deemed to have waived its arguments on this point.

And we have points why Avago's statement there is incorrect.  For one, being just now Avago is saying that you can perform these steps in any order; and so just by that alone, this is material for infringement issue just by their own word.

And then when you look at the plain language of Claim 12, Your Honor, you have, just like in Claim 1 where the said index value undergoes change from step (A) to step (B) to step (C), you're first setting index value to threshold, then you're adding the offset to the index value, then you're adding a value to that said -- modified said index value.

You're doing the same thing here, Your Honor.  You're generating a first pattern in a first portion of said codeword in response to the index value being at least as great a threshold; and then you're generating a second pattern to said

codeword, you're modifying that same said codeword following the first portion; and then you're generating a third pattern of -- a third portion of said codeword, the modified codeword, in step (B) in following the said second portion, Your Honor.

And, again, the patentee could have drafted it differently, but this is the way that the claims were drafted and the patentee should be limited to what he claimed.

And another reason why you can see, Your Honor, on Slide 17 the claim setting out a specific order is the canon of antecedent basis, Your Honor.  There is step (A) you have a threshold, and then in step (B) you have said threshold referring back to step (A).  The step (B) you have an offset and in step (C) you have a said offset referring back to step (B), Your Honor.

So we believe even without this temporal dependency that Avago tries to use, the claim language grammatically -- just even grammatically and conceptually sets out an order plainly from the claim language here, Your Honor.

**THE COURT:**  All right.  Let me get your response to the "said."

**MR. REED:**  Your Honor, if you look at Claim 12 where it uses the term "said threshold," it's simply using that as an adjective, a descriptor, back to the first portion saying that -- giving the full description of the first portion that's in that first section of the codeword.

It says in step (B), when it's talking about the second pattern, it says (reading):

"Second pattern in a second portion of said codeword following said first portion representing an offset of said index value above said threshold."

So all it's saying is that represents, you know, a different part of that decimal number, that second pattern represents a different part of the decimal number.  It doesn't say anything as to when you have to calculate that second pattern or that second portion.

As Mr. Lee indicated, if the patentee had wanted to say that, he easily could have done that.  He could have said, "After generating the first pattern, then you generate the second pattern; or subsequent to generating the second pattern, you go on to generate the third pattern."

The patentee refrained from doing so.  The patentee only indicated the positional significance of the first, second, and third patterns; and by doing that, at most the claim is neutral as to temporality, and when it's neutral as to temporality, the Federal Circuit says you construe it as not requiring a particular order.

**THE COURT:**  So there's a presumption?

**MR. REED:**  That's correct, Your Honor.

**MR. LEE:**  Your Honor, we disagree with that characterization.  Your Honor, I think there's just one case

that he's referring to, and in that case maybe -- I think the Court used or inferred a specific order based on a temporal sequence.

But, Your Honor, temporal sequences, first of all, are not the only type of dependencies that would set out an explicit or implicit order. There are definitely ways. For example, in this case, this is an algorithm, Your Honor, and algorithms -- in algorithms the order of steps are important, as which, you know, we will get into the specification shows that there is a specific order that's set out.

And even if this -- even this can be characterized as a temporal dependency as far as this is a bitstream that's being processed, and bitstreams come within a time period. And there's nothing that -- in this claim you're processing or you're generating, literally creating bits bit by bit, portion by portion, starting from step (A), step (B), step (C).

So, again, Your Honor, the order here is important, and we can get into the specification if you like.

**THE COURT:** Well, we need to move on to the next. I mean, I have your briefing on that. So unless there's something that you haven't briefed, I'd like to go on to the next patent at this point.

**MR. REED:** Just Claim 11, Your Honor, because that is actually the most relevant, as we indicated in our briefs, is the steps (B) and (C). Just to emphasize the point that in

Claim 11, when you're looking at steps (B) and (C) in particular, at the end of steps (B) and (C) of Claim 11, claim step (B) talks about adding an offset to the index value.  Step (C) talks about adding a value to said index value.  Both of them --

I'll give Your Honor a minute to find Claim 11.  Excuse me.

THE COURT:  Yeah.  Do you have it up on your slide?

MR. REED:  I do, Your Honor.

See in element (B) of claim -- excuse me -- Claim 1 and Claim 11 -- Claim 1, it talks about adding an offset to said index value --

THE COURT:  Yeah.

MR. REED:  -- based on a second pattern and a second portion.

THE COURT:  Yeah.

MR. REED:  You see that the condition precedent to that is -- I'm sorry, Your Honor.  That's Claim -- actually Claim 12.  I have the wrong language in there.

Your Honor, I apologize.  Claim 12 got copied twice into our slides.

THE COURT:  So we're talking about -- now I'm confused.  Which claim are we talking about?

MR. REED:  We're going to talk about Claim 1, Your Honor.

If Your Honor has Exhibit C to our opening claim construction brief, it has a copy of the '663 patent.

**THE COURT:**  Yeah, I have the '663 patent in front of me.

**MR. REED:**  Okay.  Looking at Claim 1, Your Honor.

**THE COURT:**  Yeah.

**MR. REED:**  I apologize for any confusion.

Looking at element (B) of Claim 1 --

**THE COURT:**  Yeah.

**MR. REED:**  -- you see it's adding an offset to said index value from step (A) based on a second pattern and a second portion in talking about positional -- the position in the codeword following said first portion; and then the condition precedent, "in response to said first portion having said first pattern."  That's element (B).  "In response to said first portion having said first pattern."

When you look, then, at element (C), it's talking about adding a value to said index value -- again that same index value from step (A), not step (B) necessarily -- based on a third pattern in a third portion positional.  It's talking about the third portion, that's a positional reference.

And then at the end, again the condition precedent is the same as in step (B), "in response to said first portion having said first pattern."  There's no dependence there, no conditional -- no contingent dependence on step (B), just

step (A).

**THE COURT:** But there is some dependence on step (A). It has to be in response to the first position having the first pattern.

**MR. REED:** That's correct, Your Honor. We mentioned this in our brief and we'll say it again, it was in response with respect to Claim 1. There is -- we agree an inference can be made that there is some temporal dependence on step (A) coming before steps (B) and (C).

**THE COURT:** Okay.

**MR. REED:** But there is no temporal dependence of step (C) on step (B). Those two steps -- that's (B) and step (C) -- can be performed in any order. Without some express language from which to derive a temporal sequence, again, the presumption is -- and they've cited no authority to the contrary from the Federal Circuit -- that the tie goes to there being no order with respect to (B) and (C) of Claim 1.

**THE COURT:** All right. I'll just give you one word on that, and then we need to move on.

**MR. LEE:** Sure, Your Honor.

If we can get back to our slides.

So if I may just address Claim 12 first with one slide on Slide 22. This is something that was not included in our briefing, Your Honor.

On Slide 22 we -- here is -- here in the prosecution

history, the Claim 12 was amended to add in step (B), "following said first portion"; and step (C), "following said second portion."

And specifically in relation to Figure 4 of the drawing of the patent, the patentee explains that an initial prefix is created or set, and e.g. 64.

And then it says (reading):

"The full unary prefix is appended or added, 64 + 2."

And then in the third portion (reading):

"The exp-Golomb suffix is appended or added, 64 + 2 + 1."

And then at the very bottom (reading):

"As such, the claim steps are illustrated in the figures and the objection should be withdrawn."

And Figure 4, if you recall, the previous Slide 21 is a flowchart, Your Honor, which a person of ordinary skill in the art would perceive as being an order of steps, distinct and separate steps, that must be performed in that specific order, Your Honor.

If I may turn now back to Claim 1, turning to Slide 9. Your Honor, Slide 9 shows Claim 1 and you have, again, an index value which you set equal to a threshold. And then in step (B), the index value is reset recursively by adding an offset, and then you reset the value of index value. And then in step (C) you add a value to said index value, again

recursively, to arrive at the final index value.

So, Your Honor, the Claim 1 on its own right sets out a specific order, and you can --

THE COURT:  So (C) when it says "adding a value to said index value," that said index value the index value after the offset is added in step (B)?

MR. LEE:  Yes, Your Honor.

THE COURT:  Where does it say that?

MR. LEE:  Well, I mean, that is what is implied, Your Honor, especially specifically because the -- what is it? -- the specification doesn't disclose a specific algorithm for Claim 1 on the decoding side; but what it does do is set out a very specific algorithm for the encoding side embodying Claim 12, and then says on the decoding side you merely reverse the binarization process, you reverse the steps.

And if Claim 12 clearly setting out an order has to be performed in order, then Claim 1 presumably would be also performed in a specific order in this way.

And, again, Your Honor, the context of this is a bitstream.  This is data processing where bits are plugged in bit by bit.

THE COURT:  All right.

MR. LEE:  And so there is a specific order that algorithm implies.

THE COURT:  All right.  We've got to move on.  Let's

go to the next one.

**MR. REED:**  Thank you, Your Honor.

**MR. LEE:**  Thank you, Your Honor.

**MR. REED:**  That concludes the '663 patent.

**THE COURT:**  Let's go to the '148.

**MR. HOLOHAN:**  Good afternoon, Your Honor.  Matthew Holohan for plaintiff.

**THE COURT:**  Good afternoon.

**MR. HOLOHAN:**  Your Honor, I'll be talking about the '148 patent.  Just to refresh the Court's recollection from the tutorial, the '148 patent deals with what's called orthogonal frequency division multiplexing, which is a communications scheme in which various frequencies are assigned to different subchannels or subcarriers.  Those frequencies are isolated from each other to minimize interference and maximize the amount of data that can be transmitted and the robustness of the signal.

The reason -- what makes OFDM systems advantageous is that orthogonality, that precise --

**THE COURT:**  That much I recall.

**MR. HOLOHAN:**  Okay.  Thank you, Your Honor.

**THE COURT:**  So let's move to the issues here.

**MR. HOLOHAN:**  So, Your Honor, the first term in dispute is "synchronization signal," and this goes to a very salient issue in the '148 patent itself because the '148 patent

deals with maintaining that orthogonality through synchronization.

And, again, this is from the tutorial, but there are two types of synchronization discussed in the '148 patent.  There's what's called frequency synchronization which is when you have two clocks running at the same speed even if they don't reflect the same time, and then you have timing synchronization which is where you have two clocks that may have the same value at a given time but they're running at different speeds.

And the '148 patent is very clear that the goal of the patent is overall synchronization, timing and frequency synchronization, to maintain true -- what the patent refers to as true orthogonality.

And this is from the summary of the invention.  I just want to emphasize this point because what Steven Ring, the inventor of the '148 patent, found was that what he calls design and operating tolerances, basically defects, imperfections in either the design or function of the OFDM receivers and transmitters, can throw off timing and frequency synchronization; and in doing so, that can impact the orthogonality of the carriers leading to data loss, impacting the quality of the communication.

Now, I want to take a moment to just talk about what he means by timing or frequency.  Now, at any given time, any particular issue with any particular device may only be

affecting timing or frequency synchronization, but you need to monitor both and you need to maintain both, and you need a synchronization signal that synchronizes both to maintain that overall synchronization.

And in the one detailed embodiment of a synchronization scheme in column 9, the '148 patent consistently refers to the synchronization as dealing with both timing and frequency.

Just to recap that point, the purpose of the invention is to maintain overall synchronization.  Overall synchronization encompasses timing and frequency.  That is what maintains your true orthogonality to maintain the quality of the OFDM system.

And to further illustrate that point, I want to talk about a specific method by which the synchronization is accomplished.

Again, in the background of the invention section, the '148 patent discusses synchronizing all of the OFDM transmitters and receivers in a given system to what the specification calls a common source or clock.  That's sort of those clocks that can run at the same rate or have the same values.

And as a refresher -- this is again from our tutorial -- the claims in the '148 patent deal with transmitters and receivers.  Claim 8, which is asserted in this litigation, deals with an OFDM transmitter.  It generates a synchronization signal, mixes that synchronization signal with data signals, does a modulation step to produce subcarrier signals.  There's

an IFFT step to produce subcarrier frequency signals, and that is what is used to build the actual transmission signal.

THE COURT:  Maybe you can remind me.  I still don't have a clear understanding of what the IFFT does and how that relates to modulation or demodulation.

MR. HOLOHAN:  Yes, Your Honor.  We'll talk about -- "modulation" is a disputed term.  I'll talk more about that.

In essence, what Claim 8 discusses is you start out with these -- with data and synchronization information.  They're just bits, ones and zeros.  The modulation step maps those values onto what are called constellation points that affect the characteristics of the wave that is actually going to be used to transmit the data.

As you recall from the tutorial, you can modify various aspects of the wave -- amplitude, frequency, phase -- in various ways to transmit that information.

At that -- and the purpose of OFDM is to assign those different frequencies.  So you have these subcarrier signals that define different frequencies.  You put those into the IFFT.  The IFFT tells you what frequencies you're going to be using at a given time so the transmitter knows when to transmit on a particular frequency, and that's what helps put together that multicarrier, multifrequency communication signal.

THE COURT:  What goes into the IFFT?

MR. HOLOHAN:  The patent calls them subcarrier

signals, and essentially what that is are just the -- strictly speaking, they're complex numbers, real and imaginary values, that represent the mapping of the data and synchronization information to constellation points which are then used to modify wave characteristics.  But we're still talking about frequencies at that point, and the IFFT inputs -- each have a different frequency that they use to input data.

So you have -- going into the IFFT, you know which frequencies you're going to use.  The IFFT tells you which frequencies to use at a given time.

THE COURT:  And from there?

MR. HOLOHAN:  From there you have -- there's some further steps in the circuit, but for the purposes of Claim 8, it's that IFFT output, the subcarrier frequency signals, that are used to actually construct the communication wave that is transmitted in the medium to carry that data and synchronization information from the transmitter to the receiver.

THE COURT:  So what's the relationship between the IFFT and modulation?  I know we may be getting ahead of ourselves, but maybe you can re-explain it.

MR. HOLOHAN:  It just has to do with -- taking a step back, what we're doing is we're taking ones and zeros and we're transforming them into an electromagnetic wave that is going to communicate those ones and zeros to a different device.  The

first step is modulation, mapping those bits onto different wave characteristics and determining which frequencies you're going to use for your subcarriers.

Now you have some numbers that are just frequencies.  You input those frequency-based values into the IFFT.  The IFFT gives you a time-based output that tells you at a given time, "I'm going to transmit on this frequency."  At time one, it's frequency one; time two, frequency two.  That way the transmitter can send different messages at different frequencies at different times, and the receiver is going to know if the synchronization is properly aligned both in terms of timing and frequency.  The receiver will know which frequencies to listen for and when to properly receive and decode the data signal.

And, Your Honor, Claim 14 does claim that transmitter which I think the parties are in basic agreement is just the reverse of the transmitter however the individual steps are defined.

**THE COURT:**  14 is the receiver or transmitter?

**MR. HOLOHAN:**  The receiver in the claim, Your Honor, yes.

And ASUS in its brief did make the point that in regards to the common source issue, that Claim 8 doesn't talk about a clock.  And I just wanted to point out that if you look at Claim 1, which is not asserted in this litigation because it

requires two different devices, Claim 1 claims a system with a transmitter and a receiver in which both a transmitter and the receiver are sent to a clock.  The receiver's clock is synchronized based on the synchronization signal.

And if you look at Claim 8 and Claim 14, well, Claim 8 is simply the transmitter from Claim 1; Claim 14 is the receiver from Claim 1.

So if you look at the claims as a whole in context, particularly in light of the specification which talks about overall synchronization using a common source, the claims each require in the context of a synchronization signal using this common source or clock, the transmitter clock, to achieve timing and frequency synchronization throughout the system.

**THE COURT:**  So let's get to the issues in dispute here.

**MR. HOLOHAN:**  Okay.  Well, Your Honor, I've been talking about -- okay.

So I've been talking about the common source and the clock, and my point -- my ultimate point with that is that when you synchronize to a common source, you are synchronizing two clocks, you are synchronizing both timing and frequency, which is what the '148 patent consistently refers to.

Just to say a few words about ASUS' position, ASUS provides a different definition than they did in the Texas litigation before it was moved to this court.  There are

essentially two definitions built into ASUS' definition, neither of which would assist the trier of fact.

The second definition essentially boils down to a synchronization signal used for synchronization, which is tautological.  The dispute here is what kind of synchronization are we talking about.  ASUS' definition does nothing to elucidate that issue.

It looks like I'm getting interrupted.

**MR. NEWTON:**  Yeah.  Your Honor, if we could, we'd like to short-circuit that.  We're happy to go back to our Texas construction.  We tried to be cooperative with Funai when they came in the case, so we're happy to go back to a definition rather than say you have to do "timing and frequency," "timing or," and then don't introduce the language about you have to add the synchronization signal prior to modulation because we don't think that's part of the definition of "synchronization signal."

**THE COURT:**  So where does that leave us then?

**MR. NEWTON:**  Well, if you could turn to my -- can you switch to my slides real quickly?

Your Honor, I'll show you just where we are.

So on our slides for the '148 patent, it's Slide 4.  And so if you see there, we're happy to, as an alternative, adopt "a signal to achieve or maintain at least frequency or timing synchronism," which is very similar to Avago's except they

would say it's got to achieve "frequency and timing synchronism"; and then they also put the language that "the signal has to be added to a plurality of data signals prior to modulation."  We think that's a limitation of some of the claims but not others.

And with that, I didn't mean to interrupt you, Mr. Holohan.  I just wanted to short-circuit to that definition maybe.

MR. HOLOHAN:  Your Honor, I will discuss, you know, the burst and predetermined frequency issues if ASUS is pulling back from that.

In terms of the limitation "added to a plurality of data signals prior to modulation," so the parties are in agreement that's a requirement of Claim 8.

Again, in the context of the claims, the synchronization signal received in Claim 14 was added to a plurality of data signals at some point in the transmitter before it got there. And I think particularly if you look at the file history, how they talked about the synchronization signal, I think that that limitation is a characteristic of the synchronization signal itself, and I would want to keep that in the definition.

MR. NEWTON:  And, Your Honor, we would say to that that there's no need to add it at the other end because you could modulate one, modulate the other, and then put them in the IFFT and never add them before modulation.  So this really

does add a significant step that's not in, for example, Claim 14.

THE COURT: Well, let me go back to ASUS' Slide 4. Tell me, in terms of the frequency and/or timing issue, what are the differences now between the parties?

MR. NEWTON: I would say that Avago wants to have both frequency and timing, and we think it's just a synchronization signal; and depending on what claim you're focusing on, some claims require the synchronization signal to do timing, others frequency, and others -- you know, for example, if I can turn you to Slide 9, Claim 10 calls for a synchronization signal that comprises a reference signal containing at least one of a reference amplitude and a reference phase.

Now, using that as your synchronization signal, you can adjust the phase of the signal, and that adjusting the phase, at least according to Dr. Katti in his deposition, was a form of timing synchronization but it's not frequency.

So it's timing but not frequency, and that's a limitation in one of the claims where it's telling you, you know, the synchronization signal should be a particular type of synchronization signal and that type of synchronization signal doesn't do both frequency and timing. It can do one or the other because phase is a mathematical combination of frequency and timing; but if you decide to measure the timing, then you don't know the frequency and vice versa.

**MR. HOLOHAN:** Your Honor, Claim 10 uses the term "comprises," which means that the synchronization signal, whatever it does, also includes this reference signal containing at least one reference sample during the reference phase. That doesn't mean you can't -- sorry. That doesn't mean it can't do other things.

And, again, going by the stated purpose of the invention in the specification, that overall synchronization to maintain true orthogonality, I don't read Claim 10 as saying you can only do this kind of synchronization in this claim.

**MR. NEWTON:** And --

**MR. HOLOHAN:** What --

**MR. NEWTON:** Excuse me.

It doesn't say "further comprises," Your Honor. And, in addition -- you know, there were OFDM systems well before this patent. They had to do all these forms of synchronization; but whether when you say the words "synchronization signal," there is a single signal that does timing, frequency, phase, everything you need to do, is what's at issue here.

And there's nothing in the specification that says, "Hey, we've come up with a new and better form of synchronization signal that does all this synchronization in a single signal." That's just -- you won't find that in this spec anywhere. They rely on known technology and known synchronization signals for achieving either timing or frequency or phase synchronization.

**THE COURT:** There's a description in the specification for the '148 on the summary of invention that says the frequency synchronization signal may also represent timing information usable at the second station to time synchronize the second station to the first station.  Is that significant at all when it says "may also," or is that just referring to -- well, maybe you can tell me.  What does that refer to?

**MR. HOLOHAN:** Your Honor, I think what that --

**THE COURT:** It's Column 3, line --

**MR. HOLOHAN:** Yeah.  I see that, Your Honor.  Thank you.

**THE COURT:** -- 44.

**MR. HOLOHAN:** I think what that's referring to is that the synchronization signal which does timing and sequencing may do timing synchronization in this particular way.  It's illustrating a way to accomplish that overall synchronization using -- and it gives examples of different types of timing information -- leading, trailing edge, the burst signal -- to define a precise reference point in time.

**THE COURT:** So it's just one of several ways by which you can achieve timing synchronization?

**MR. HOLOHAN:** Yes, Your Honor.

**THE COURT:** So not much to be read into that particular reference there?

**MR. HOLOHAN:** I agree, Your Honor.

**MR. NEWTON:** Your Honor, I think our expert would disagree. We think that's language just as you were originally proposing suggesting that this signal may be used for frequency but it also may be used for timing, and it may include timing information or it may not depending how you set your system up.

**THE COURT:** All right. Go on. What else do you want to tell me in support of your position?

**MR. HOLOHAN:** So just on that point, Your Honor, the '148 patent in the specification as well as the claims just gives specific examples, and I think this is one of the disagreements between the parties' briefs.

The '148 patent does give examples of how to accomplish frequency synchronization, how to accomplish timing synchronization. There are certain claims that are specific as to how you do that; but, again, if you go to the overall purpose of the patent is -- the explicitly stated purpose of the patent is overall synchronization, correcting for timing and frequency defects in real-world OFDM systems.

Now, as I said at the outset, at any given time you may only have a problem with one or the other or neither of them; but you need to check, monitor, maintain, synchronize both of those values to maintain that true orthogonality.

**THE COURT:** Is there somewhere that you can point to in the specifications that says that clearly about both types of synchronization being sort of indispensable to this

invention?

**MR. HOLOHAN:**  Your Honor, it's the -- can I get my slides back?

(Pause in proceedings.)

**MR. HOLOHAN:**  So the Slide 37 there's a quote from the bottom of Column 3, leading into Claim 4.

**THE COURT:**  Well, I'm going to look at the actual.  So where?  "With this aspect"?

**MR. HOLOHAN:**  Yeah.  So -- yes, Your Honor.  (reading)

"With this aspect of the invention it is possible to reduce the effects of design and operating tolerances" -- those are those imperfections in these real-world devices -- "which might normally cause slight differences in the timing or frequency associated with each independent OFDM device.  Such small variations would normally tend to reduce the true orthogonality of the different subcarriers generated or used by different OFDM devices and, hence, produce a degree of interference between the subcarriers.  By improving the overall synchronization, a high degree of orthogonality can be attained leading to improved isolation between the transmission and reception subcarriers."

And that is the purpose of OFDM.  It is those truly orthogonal signals that don't interfere with each other to maximize the robustness of the communication signal and data

transmission.

**MR. NEWTON:**  Your Honor, if I may.  In response to that, I'd say notice that the language is "timing or frequency" in that paragraph that Mr. Holohan just read.

And I'd also say --

**THE COURT:**  It says slight differences in either of those could cause a problem.

**MR. NEWTON:**  Right.

**THE COURT:**  And that suggests the invention is addressed to preventing those problems, so it wouldn't have to cover both.

**MR. NEWTON:**  Does it though?  I would think that you'd have to -- if you fixed one, you're at least making one better.

**MR. HOLOHAN:**  Your Honor, either type of difference is going to throw off the orthogonality.  You might improve the orthogonality, but you want to maintain true orthogonality. This isn't a halfway patent.

**THE COURT:**  So where else -- is there something that indicates -- other than sort of by inference here, is there something express about synchronization on both fronts?

**MR. HOLOHAN:**  Yes, Your Honor.  If you look at column 9 --

**THE COURT:**  Yep.

**MR. HOLOHAN:**  -- there's that timing and synchronization embodiment section that begins right at the top

of the page.

THE COURT: At line 1, 2?

MR. HOLOHAN: Yeah. Right at the top it says (reading):

"The uplink and downlink channels will only be truly isolated if the subcarriers in each channel are orthogonal. In general, this is difficult to accomplish with some of the subcarriers being generated by one transmitter and others being generated by a completely different transmitter. Small frequency variations may occur within the design and operating tolerances of each transmitter and further variations may occur due to local conditions, such as temperature, noise, or interference. Furthermore, the modems might be manufactured by different manufacturers."

So there's the problem, that true orthogonality.

The very next sentence (reading):

"Particularly important advantages can be attained" -- "can be obtained by synchronizing the slave modem to the master modem both in terms of frequency generation and timing."

And the balance -- the rest of that description going into column 10, if you look at line 35 to 38 in column 9 and line -- yeah -- 35 to 38 in column 9, they're talking about the kind of synchronization they're doing in the patent here in this

preferred embodiment, the specific synchronization embodiment which is what the claims at issue deal with, and they're talking about timing and frequency consistently.

MR. NEWTON:  May I respond to that, Your Honor?

THE COURT:  Yeah.

MR. NEWTON:  I believe that's a preferred embodiment. That one is claimed actually I think in Claim 16 where they say, "Not only are we going to control the frequencies in the transmission direction, but if a receiver then is going to transmit back, we're going to control those frequencies." That's not claimed until dependent Claim 16.

THE COURT:  But, nonetheless, the specification talks about frequency and timing, which is mentioned several times now in column 9.

MR. NEWTON:  It is, and we're not saying that you can't have a synchronization signal, particularly a number of synchronization signals, in which you would control frequency and timing; but we're saying the patent does not require reading into the term "synchronization signal" that every synchronization signal must be both timing and frequency.

In the example that I gave you with regard to the reference amplitude and reference phase is an example of a synchronization signal that doesn't do timing and frequency.

THE COURT:  What's your response to that point?

MR. HOLOHAN:  As I said earlier, Your Honor, Claim 10

says that whatever the synchronization signal does, it has to include this particular information to do this particular thing.  It can do other things.

The '148 patent doesn't talk about -- it talks about using a synchronization signal to accomplish frequency and timing; and it can do other things but the overall synchronization, the way that the '148 patent discusses synchronization, encompasses at least those two things.

**MR. NEWTON:**  And, Your Honor, we'd respectfully disagree.  There's not enough in the specification to say that it's clear that a synchronization signal as defined herein must be able to do both timing and frequency.  There are examples of signals that do do timing and frequency, but there's examples of those that don't.

And, in fact, if you look at Figure 11, Figure 11 shows you inserting two different reference signals, which they claim is a synchronization signal.  And, you know, is a synchronization signal supposed to be both the elements 98 and 100, or just some of those, or enough of them that you do frequency and timing?

There's just not that clear of an indication in the specification that says that "synchronization signal" in the abstract or the generic must be interpreted in a special way to require it to accomplish both frequency and timing synchronism.

**THE COURT:**  I'll give you the last word.

**MR. HOLOHAN:**  Your Honor, in regards to Figure 11, Mr. Newton seems to be introducing a new issue, which is whether a synchronization signal is one symbol or multiple symbols.  I don't view that on the current record, the current briefs, as a salient issue.  I think what the patent deals with is asserting, you know, a synchronization signal that accomplishes timing and frequency synchronization alongside data signals that are modulated -- you know, that are modulated, put through an IFFT to generate a transmission signal.

**THE COURT:**  All right.  Is there another issue with respect to the '148?

**MR. NEWTON:**  Yeah.  I think an important term, Your Honor.  I'd like to respond to some of the things Mr. Holohan mentioned about modulating and demodulating.

**THE COURT:**  Yeah.

**MR. NEWTON:**  If you could go back to our slides and in particular start with Slide 12.

So, Your Honor, I put up a slide that Avago put up in its *Markman* and I put up Claim 8; and in particular what Claim 8 requires is that you first in the red "add a synchronization signal to a plurality of data signals," and those are received by the modulator.  The modulator creates subcarrier signals, not just signals.  It calls them subcarrier signals, and you were asking what those are comprised of.  We believe those are

not just the map signals.  Those are actually the map signals multiplied by carrier signals.

Then what happens in the IFFT, or the inverse fast Fourier transform, is a transformation.  We talked about the mathematics of that in the tutorial, but that basically takes signals in the frequency domain and converts them through a fairly sophisticated process to a time domain signal.

So I think there's basically -- moving on to Slide 14 -- agreement that you need to vary the characteristics of a subcarrier wave and you need to vary the amplitude of the phase or something, and you need to do that based on what you have in the synchronization signals and the data signals.

What we object to is them adding this idea that you're going to create the subcarrier waves sometime later in the process.

So if we go for a minute back to -- I'm going to take you to Slide 17, and this is kind of a concrete example about what the dispute is.  So in the tutorial we explained that you start out with, let's say, four bits -- $b_0$ through $b_3$.  You then put them through a mapper, which converts those bits to a real number and a complex number; the real number being (I) and the complex number being (Q).

Now, Avago would say that's enough for modulation.  We would say it's not because what you need to do is the next step.  I need to take the (I) and multiply it by a cosine; I

need to take the (Q), which is a complex number, multiply it by the sine; and then add those things together to get a modulated wave, which is represented by the equation (A), which is an amplitude, and then cosine omega t plus phi, and that phi is the phase.  So modulation is about changing the characteristics of a wave.  So as I change the bits -- $b_0$, $b_1$, $b_2$, $b_3$ -- I will get different amplitudes and different phases.

So turning to 18, I've shown how this process works in the context of what we might call 16-QAM, or a quadrature amplitude modulation, where 4 bits are in and I map first to a constellation having 16 possible points.  So the $b_1$ and the $b_0$ pick the imaginary numbers, and the $b_3$ and $b_2$ pick the real number, the (I).

But modulation doesn't stop there.  Turning to Slide 19, the mapping alone just gives me a real number and an imaginary number.  To do anything that the plain meaning would consider to be modulation, I need to do something to a carrier wave.  So I need to take those (I)s and (Q)s and multiply them by the cosine and sine waves.

So going to the plain meaning, we introduced a number of dictionary definitions, and every one of them would have supported the idea that "modulation" means taking some data signal and impressing the data in that signal somehow onto a carrier wave.  And we cited in particular in our brief the definition from Ted Rappaport's book, and that supports our

definition.

Now, you won't find any dictionary support that says, "Hey, you can create the carrier wave later and mapping alone is enough."

Now, why does this matter?  Well, during the prosecution history -- and I'm just now going to move on -- they amended the claims to give the specific order that we talked about in Claim 8.  So you're going to first add synchronization signals to data signals.  You're then going to take the synchronization signal and data.  You're going to modulate them to create subchannel or subcarrier signals, and then you're going to put those into the IFFT.

And they told the Patent Office that this Saeki patent did not disclose or suggest performing modulation before the IFFT.  So it's somewhat important to look at what exactly does Saeki do.

So Saeki teaches in Slide 27, when you go through the serial-to-parallel converter and then the source banks 12 and 14, that you take a bitstream and then you convert it to two signals -- a real signal, which happens to be two bits, and an imaginary signal, which happens to be two bits -- and I do that for 1,024 carriers.  So the first four bits that come in are converted to a two-bit real signal and a two-bit imaginary signal, and that goes on carrier 1.  And then I do that, you know, carrier 2 all the way down through 1024, and those are

the inputs to the IFFT.

Then the IFFT does the mathematical operation of Fourier transform, the inverse version of it.  We go through those target banks 18 and 20, and they simply add guide bands or guard bands.  And then in the digital-to-analog converters 22 and 24, we're just converting signals from the digital domain to the analog domain.

So then if we go to what happens in the box labeled "26 Orthogonal Modulation," what happens there is I take the real signal, I take the imaginary signal, and I multiply them by a sine wave and a cosine wave and add them together.

And specifically -- although I've got the cite wrong there, on the next slide it's right -- the relevant portions of the Saeki patent are at column 4, lines 53 through 58, and they say what you're going to do is you're going to AM modulate a sine and a carrier -- a sine and a cosine carrier.

What that means when you're AM modulating, that's amplitude modulating.  It simply means multiply the signal so you adjust the amplitude.  So in this case you take the imaginary signal in Slide 30, I multiply it by a cosine wave; I take the real signal, multiply it by a sine wave; add those two together.

So that's all that happens in that box on the opposite side of the IFFT.  There's no mapping in Saeki on the other side of the IFFT.  Prior to the IFFT, at least we know -- and I

think even Dr. Katti, Avago's expert, would admit -- I'm taking a bitstream and converting it to a real number and an imaginary number, and that goes into the IFFT.

So Saeki, arguably, maps before the IFFT, and then for certain it varies the amplitude and phase of a carrier wave after the IFFT.

So when I look back and say, "Well, okay.  You said that Saeki does not disclose or suggest performing modulation before the IFFT.  What did it do before the IFFT?"  Well, we know it converted bitstream to real and imaginary.  And Dr. Katti would say, "Well, that's not -- it's not clearly mapping."

But let's look at what it does after the IFFT.  The only thing it does after the IFFT is convert real or imaginary signals from digital to analog and then AM modulate those, which means nothing more than multiply a sine wave by I think the real or imaginary signal and the cosine by the opposite and then add them together.

So that is modulation.  That taking of a real or imaginary number and multiplying it by a carrier wave is modulation in the way they characterize Saeki.

Now, there's no mapping based on what I've shown here and based on any declaration support that happens after the IFFT in the Saeki patent.  So it's inappropriate to call mapping by itself modulation.

Now, Dr. Lyon -- or Dr. Katti, Avago's expert, never

testified, in his declaration anyway, about what happened with respect to Saeki. In fact, he didn't comment on it. It was only in his deposition that he discussed it.

Our expert, Dr. Lyon, said, "When I read Saeki, that's for sure doing mapping. And why do I know that? Well, in part because I can look at what the prior art did. So when I'm interpreting Saeki, let's look at how the prior art did things."

And in Dr. Katti's deposition, Avago's expert, I put five OFDM prior art references before him, and every one of them did mapping before the IFFT. And I asked him, "Are you aware of any systems that didn't do the mapping before the IFFT?" And he couldn't think of any.

And so when you're looking at Saeki and you want to know does it map before the IFFT, yes, it does; but the key thing, the real modulation happens after because I take the real signals and the imaginary signals and I actually apply them to a carrier after the IFFT. So the key thing about what is modulation, it's that you somehow affect a carrier wave. It's not the mapping.

Because of this, we suggest our definition is in line with the plain and ordinary meaning. I think Avago's definition is one where they're trying to move when you create the carrier wave to some point later to avoid the distinction they made over Saeki.

THE COURT:  All right.  Your response?

MR. HOLOHAN:  May I have my slides, please.  Thank you.

Your Honor, there's a lot to respond to there.  I'll take it point by point.

As an initial matter, I feel that Mr. Newton's argument went well beyond their response brief, particularly in terms of the details of the cosines and the sines and that particular discussion.

But rather than focus on that, I would like to focus on what the '148 patent specification actually says about modulation.  And it's important to note, if you look at column 6, and I have the diagram mapped out here, is that the coded output, the synchronization and data signals, are inputted into $N_1$ channels of a multichannel modulator for encoding the signal.

So really what "modulation" means is encoding, creating a correlation between the signals and those constellation points that, yes, will be used to modify wave characteristics of a subcarrier wave.

As we discussed earlier, the encoded output of the modulator is put into the IFFT, and there are additional steps in the circuit depicted in Figure 3 until you get to the digital-to-analog converter, which converts the signals to analog form; and it's at that point when you have your

electromagnetic wave that actually transmits the data.  And ASUS didn't mention, didn't discuss the converting DAC step at all in their brief.

If I could make an analogy.  So we basically agree that modulation is varying the characteristics of a wave.  If you have a blueprint of a house, you can vary the characteristics of that house without actually building a house and changing it after you've built it.

What the encoding modulation does in the '148 patent is it gives you all of the information you need to construct that carrier wave and modulate -- and transmit it across the medium.

Now, you can adjust the characteristics of that wave before the wave exists, just as you can adjust the characteristics of a house you have not yet built.  I'm going to make the front door bigger by erasing the front door and drawing a bigger front door.  So that's the basic idea.

And the encoder --

THE COURT:  Well, you're varying the design of the house, not necessarily varying the house itself just by changing the blueprint.

MR. HOLOHAN:  You're varying the characteristics of the house.

THE COURT:  Characteristics of the designed house, not of the house itself.  I mean, that's all terminology.

MR. HOLOHAN:  Yes, Your Honor.

THE COURT:  That's not very helpful.

MR. HOLOHAN:  Okay.  Well, what I think is helpful is the specification of the '148 patent which talks about the --

THE COURT:  What's the relationship between Figure 3 and Figure 4?  Is there one?  You cited Figure 3 and it ends with a DAC.

MR. HOLOHAN:  Yeah.  Figure 4 is the receiver.

THE COURT:  The receiver?

MR. HOLOHAN:  Yes.

THE COURT:  And Figure 3 is the transmitter?

MR. HOLOHAN:  Yes, Your Honor.

So you can see in Figure 4 there's the ADC, the analog-to-digital converter --

THE COURT:  Right.

MR. HOLOHAN:  -- which takes that E and M wave and puts it back into the digital space, and then --

THE COURT:  So what about Figure 3 tells me that modulator doesn't actually modulate the wave, that you're changing the characteristic of the wave at that point before you go into the IFFT?

MR. HOLOHAN:  Because there's no wave until you get to the digital-to-analog converter.

MR. NEWTON:  Your Honor, we disagree with that.

THE COURT:  Why is there no wave?

MR. HOLOHAN:  Because the digital-to-analog converter

is what takes digital information and creates the wave.

**THE COURT:**  Yeah, but you're not modulating after that.  It's already -- whatever you're converting has already been modulated.

**MR. HOLOHAN:**  Yes, Your Honor.  You've used the --

**THE COURT:**  Where does it occur other than modulate -- at block 32?

**MR. HOLOHAN:**  Block 32 is the encoding step when you set the characteristics of the wave.

**THE COURT:**  All right.  So where --

**MR. NEWTON:**  May I respond to that, Your Honor?

**THE COURT:**  Well, no.  I want -- still that doesn't answer my question.

What else happens?  You say you simply encode in block 32.  When does it actually have an effect on the shape of the wave?

**MR. HOLOHAN:**  When the wave is generated, Your Honor, at --

**THE COURT:**  That's just generating the wave based on the input --

**MR. HOLOHAN:**  Yeah.  It takes the input --

**THE COURT:**  -- and then reflects some modulation.

**MR. HOLOHAN:**  Yes, Your Honor.  So there's --

**THE COURT:**  Well, there's no modulation.  You're saying it's being instructed to.  So there actually is no modulation until the wave itself is generated?

**MR. HOLOHAN:**  No, Your Honor.  I'm saying the modulation happens at the modulator.  The modulating is encoding.  The modulator 32 is for encoding the signal.  It encodes the data and the synchronization information into a signal, and then it generates -- and then it further processes the characteristics of the wave throughout the circuit until the wave itself is generated by the DAC.

**MR. NEWTON:**  May I respond to that, Your Honor?

**THE COURT:**  Yes.

**MR. NEWTON:**  So it's encoding the signal into $N_1$ subchannels, which is used in the patent synonymously with subcarriers.  The DAC is only said to do digital-to-analog conversion.

And, in fact, one of the key parts of this patent was to adjust the number of subcarriers that the transmitter and receiver could use.  So if the transmitter needed more, you could adjust it.

And the control circuit that controls the number of subcarriers that is used, it doesn't talk to the DAC or the digital-to-analog converter.  It talks to the modulator and says, "Hey, Modulator, instead of using 10 carriers, it's really busy, go ahead and use 20."  And then the receiver will only get 10 or whatever the number is.

So we would argue that the subcarriers, the actual carrier waves, are generated in the modulator 32 rather than the D-to-A

converter 40.

**MR. HOLOHAN:**  Your Honor, the subcarriers are defined in the modulator.  That doesn't mean that they've actually been generated as electromagnetic waves at that point.  The '148 patent uses modulation to refer to encoding.

**MR. NEWTON:**  Your Honor, we think that encoding involves multiplying by something that's a sine or a cosine wave even if it's in the digital domain.  You can do this all in digital, but you need to decide what your carrier wave is going to be, not just decide what your (I) and (Q) signals are going to be.

**MR. HOLOHAN:**  The discussion in the specification doesn't support that limited view.  It just means encoding. It's encoding to a subcarrier signal whether you take that -- whether you have a physical wave at that point or you use that information with varied characteristics to generate a transmission wave later in the process.

**THE COURT:**  So the carrier wave is a transmission wave?  That's the ultimate product coming out of the transmitter?

**MR. HOLOHAN:**  Yes, Your Honor.

**MR. NEWTON:**  Your Honor, we'd say the subcarrier waves.  Here it's in the context of subcarriers.  It's the carrier waves that are used and they're actually modulated.  So you have to put the data onto the subcarrier wave not just

create the mapping that will eventually be used to put information onto the wave.

THE COURT:  What's the difference between a subcarrier wave and a carrier wave?

MR. NEWTON:  Subcarrier just means there's multiple of them.  So rather than -- remember in the context of OFDM, it's a multicarrier modulation scheme?  I could use one carrier and put all my data onto that; or I could say put four bits on the first carrier in a multicarrier modulation scheme, which would be subcarrier one, put the next four bits on the next subcarrier, which would be, you know, subcarrier two, et cetera.

THE COURT:  So does the transmitter transmit subcarrier waves?

MR. NEWTON:  Well, this is what's interesting about these type of systems.  In the IFFT, it then does a magical addition of these things and eventually creates them into a single time domain signal, and that's kind of the magic of having this IFFT apparatus and it does the mathematics very quickly.  So in the end you're submitting a single signal, which is a bunch of them added together in a sophisticated mathematical algorithm.

THE COURT:  But in the end it's a signal carrier wave?

MR. NEWTON:  At the far end, yes.

MR. HOLOHAN:  And, Your Honor, if you look at

Slide 43, the specification's discussion of the DAC, it specifically says that it converts those signals, the signals that are the output of the IFFT, into analog form; i.e., a wave.

MR. NEWTON:  It doesn't say that.  It just says into analog form.  It doesn't say anything about a wave.

MR. HOLOHAN:  Well, it says "to analog form for transmission to the communication line."  I don't know what else a communication across --

THE COURT:  Well, at that point you all agree it is a wave.  It may be complicated and it represents a sum of subcarrier waves, but it's a wave.

MR. HOLOHAN:  It's a wave that's defined based on the encoding earlier in the process.

THE COURT:  Well, then, your proposed construction, "varying some of the characteristics of the subcarrier waves to be produced at a later time" --

MR. NEWTON:  Well, Your Honor, for the record, we could live with their construction if they got rid of the "at a later time" because they're just putting it in the context of the subcarrier waves and the context of the claim.

THE COURT:  Well, yeah.  The fact that you've now limited to the subcarrier waves, that's different from the ultimate wave that is produced by the DAC.

MR. HOLOHAN:  Well, Your Honor, by varying the

characteristics of a subcarrier wave, you vary the characteristics of the carrier wave.  The issue is that --

**THE COURT:**  Well, you may have -- that may be the end result, but if you're -- where in this block diagram are the subcarrier waves generated?

**MR. HOLOHAN:**  At the DAC.

**THE COURT:**  You mean before the AC there are no subcarrier waves?

**MR. HOLOHAN:**  There are subcarrier signals that are generated based on the encoding of the data and the sine that happens in the modulation step if you look at Slide 40.

So the multichannel modulator encodes the signal into $N_1$ subchannels, and the '148 patent uses "subcarriers" and "subchannels" interchangeably.

What the modulator -- what the encoder -- what the modulator/encoder is essentially doing there is taking each individual sync or data signal and, you know, mapping it onto a subcarrier and that subcarrier is ultimately going to be a subcarrier wave, which is part of the overall carrier wave. But there are no physical waves in the system until you get to the DAC.

**MR. NEWTON:**  And, Your Honor, I think they gave up that when they distinguished Saeki.  Because if you look what Saeki does, Saeki does every bit of what Mr. Holohan is claiming you need to do to have modulation in the '148.  It

definitely did this creating (I) and (Q) signals, or real and imaginary signals, for multiple subcarrier inputs to the IFFT.

**MR. HOLOHAN:**  Your Honor, I can discuss Saeki if it would be helpful.

**THE COURT:**  Well, all right.  Briefly.

**MR. HOLOHAN:**  Yes, Your Honor.

I just want to note, it unfortunately appears to be a battle of experts here.  But the actual disclosure of Saeki, the specification, does not mention any QAM modulation or any mapping, any constellation points at all until well after the IFFT.

Dr. Katti did testify during his deposition in the Texas case that that sort of initial step of converting into real or imaginary numbers has no context.  You don't know what you're doing there.  That has no meaning until you get to -- until you use those values later in the process after the IFFT and this QAM modulation step.

I also want to note, Your Honor, that Saeki was distinguished on two grounds.  In addition to disclosing the modulator after the IFFT, it also fails to disclose adding the synchronization signal to the data signals before the IFFT.

And if you look at Slide 49, you can very clearly see where the modulators -- i.e., the encoders -- appear in both Saeki and the '148 patent.

**MR. NEWTON:**  We obviously disagree with what they

disclose there, Your Honor.

THE COURT:  You disagree with what?

MR. NEWTON:  With what Mr. Holohan has disclosed on Slide 49 there.

If you go through our presentation, we believe that what he's calling the modulator in the '148, the encoding just to the constellation, that occurs on the other side of the IFFT in Saeki, and the only thing that happens in the box that he's highlighted in Saeki as the QAM modulator is multiplying real and imaginary signals by an actual carrier wave signal and then adding them together.

MR. HOLOHAN:  Your Honor, the '148 patent specification says that the modulator is for encoding.  So whatever the applicant -- the examiner understood to be happening at the modulation step in Saeki, it must be encoding.

MR. NEWTON:  Encoding into subcarrier signals.

THE COURT:  All right.  Anything further on the '148?

MR. NEWTON:  No, thank you.

MR. HOLOHAN:  No, Your Honor.

THE COURT:  All right.  Let's move to the next one.

MR. NEWTON:  Your Honor, does it make sense to go to the '830?  I think it's a more detailed patent.  Because if we're going to finish, the '730 and '835 can go on our briefing, in my opinion.

THE COURT:  Let's prioritize.  If you want to go to

the '830, let's go to the '830.

MR. CONNOR:  Good afternoon, Your Honor.

MR. NEWTON:  Your Honor, just to short-circuit here, on the detector limitation, they've raised some case law.  We understand what it is.  We don't want to give up our position, but we understand -- based on your prior decisions and the *PMC* digital detector case they cite, we understand where things will come out.  So we're not waiving, but it's not worth arguing so we can move on to the indefiniteness.

MR. CONNOR:  And just for clarification, what he's talking about with respect to a detector is whether the limitation "a detector for detecting said synchronization codes" is a means-plus-function limitation.  And the *PMC* case in 1998 basically said -- in fact, it did say that a detector is the type of word that connotes sufficient structure to avoid application of means-plus-function.

THE COURT:  So for purposes of --

MR. NEWTON:  I was involved in that case.  I think it's a not well-reasoned decision, and I think it's really contrary to the evidence at the ITC both from all experts.  Suffice it to say, that is the Federal Circuit law right now and we understand you've applied it, Your Honor.

THE COURT:  Right.

MR. NEWTON:  So we're not waiving any arguments.  We understand where that's coming out.

THE COURT:  All right.

MR. CONNOR:  Okay.

THE COURT:  Okay.  Good.  Thank you.  I appreciate it.

MR. CONNOR:  So then the other term in the '830 patent, the Maturi patent, that's in dispute is whether the term "synchronization code" by itself is indefinite.  And under the *Nautilus* case law from the Supreme Court in 2014, definiteness requires that a patent's claims, viewed in light of the specification and the prosecution history, inform those of skill in the art about the scope of the invention with reasonable certainty.

And with respect to the '830 patent, there is absolutely no uncertainty about what a synchronization code is.  In ASUS' responsive claim construction brief, they actually provide a definition.  They say (reading):

"The synchronization code is a special pattern of ones and zeros used to designate the beginning of a frame of compressed audio data and may be utilized by the decoder to synchronize to the audio bitstream."

If that alone weren't dispositive of the issue, the '830 patent itself provides robust disclosure about what a synchronization code is.  It tells one of skill in the art where a synchronization code exists.  For instance, in column 2, lines 47 to 51, the '830 patent teaches that each audio frame includes a synchronization code and a frame header

followed by audio data.

And then later --

THE COURT:  Give me that again.  Column --

MR. CONNOR:  Column 2, lines 47 to 51.

THE COURT:  Okay.

MR. CONNOR:  And then earlier in the patent in column 1 *at* the bottom in lines 58 to 63, it tells one of ordinary skill in the art what a synchronization code is according to the MPEG standard.  It says it's a very simple 12-bit code, in binary it's 12 ones, 12 sequential ones, where it's FFF in a hexadecimal notation.

So the patent is clear about where synchronization code would exist, what the actual synchronization code is, and there's simply no dispute.

ASUS has no evidence in its brief at all, either by expert testimony or otherwise, that a person of ordinary skill in the art would have any difficulty understanding what a synchronization code is, and that's important because ASUS has the burden by clear and convincing evidence of proving that a synchronization code is indefinite; and on the record that we have before us, it just simply is not.  One of skill in the art would know exactly what a synchronization code is.

THE COURT:  All right.  What's your response?

MR. LEE:  Yes, Your Honor.

If we can get our slides.

Your Honor, just looking at Slide 4 just to frame the issue here, Your Honor, the standard is *Nautilus* where the indefiniteness is with reasonable certainty for those skilled in the art about the scope of the invention.

But, Your Honor, here it doesn't take an expert to know that the term "synchronization code" is indefinite because, first of all, there are multiple instances of the term in a single claim; and in each instance of the term, that term can mean either a valid code, an invalid code, or both.

And simply there cannot be a single construction ascribed to this term to fit with what is claimed, Your Honor.

So if we move on to the next slide.

Again, to frame the issue here, Your Honor, the *Chef America* case is a famous case where the patentee was held to the language of its claims even though it arrived to an absurd result where you bake -- heat a dough to a temperature of 400 degrees; and while that might not be what a person of ordinary skill in the art would have seen based on the preferred embodiment, the patentee was held to what was claimed.

And so it's a very similar situation here, Your Honor, that the language used in the claims is not what was disclosed in the preferred embodiment and the patentee should be the one that bears the burden of that error, Your Honor.

**THE COURT:** But why is that -- why does that prove

indefiniteness?

MR. LEE:  Your Honor, indefiniteness in terms of what -- what this term means in each instance it's used in a claim is -- simply can't be determined, and it's -- because it's used inconsistently and it is used in a way where a single construction can't be ascribed that, Your Honor, by all means, I feel that would be an indefiniteness issue, Your Honor.

THE COURT:  Let me ask.  So the argument, as I understand it, is it could be one of several things -- a valid code, an invalid code -- and because it's a broad term that encompasses both and can mean a different code in different contexts, it's indefinite.  I guess that's the argument.

What's your response?

MR. CONNOR:  I guess.  The patent claims themselves don't say "valid" or "invalid."  They just say "synchronization code."  And the '830 specification by itself says that an invalid code and a valid code have the exact same sequence of bits, in this case the 12 ones.  The only difference between them is the location of the bits within the bitstream.

A valid synchronization code is one that exists before the frame header and it tells the decoder where to start synchronizing the data.  An invalid synchronization code is also 12 ones in a row.  It just happens to fall within the audio bitstream.

The claims themselves are all about distinguishing between

valid and invalid.  Attempting to limit the term "synchronization code" to either a valid code or an invalid code would actually be doing exactly what counsel here is saying you should avoid, which is importing limitations into the claims.

The claims themselves do not say "valid" or "invalid." They simply say "synchronization code," and there really is no dispute what that is.  It's 12 ones.

**MR. LEE:**  Your Honor, if I might respond to that.

If you look at Slide 28, in Avago's reply brief, they took a definition out of our background section that came from the specification as a proposed alternative to the construction here.

And as an initial matter, the definition that they chose is ambiguous on its face just because the special pattern of ones and zeros, that being "the initial portion" -- "the latter portion used to designate the beginning of a frame of compressed audio data," we don't know if that term as a whole means just the valid codes or both valid or invalid codes.  And apparently right now it sounds like Avago is advocating for just -- for both valid or invalid codes in the MPEG context, the FFF string.

But, Your Honor, as you can see, if you -- just walking through Claim 5 -- and this is indicative of all the independent claims -- we see in the header the bitstream

further comprises a data header following each special patterns of ones or zeros used to designate the beginning of a frame, including information from which intervals between successive special patterns of ones and zeros can be calculated.

Only valid codes, Your Honor, has a data header following it, specifically a data header with information from which you can calculate the frame -- that involve the frame, Your Honor.

And then moving forward, in the sensor limitation and the comparator limitation, you are -- one of those has to be a valid code in order to encompass the preferred embodiment, Your Honor.

When you're -- if you recall from the tutorial, one of the big aspects of this invention is to compare the intervals between FFF strings, whether valid or invalid, and you compare that interval to the frame interval, the one that's been calculated from valid code intervals, Your Honor.  So for this claim to make sense, you need to compare intervals between all FFF strings to interval between valid FFF strings.  So, Your Honor, if you're going to compare here, it's got to be one or the other.

And then -- sorry.  And in the final limitation there, too, "a sensor for sensing said data header in calculating intervals between successive special patterns of ones and zeros," also can only be a valid code just because only valid codes have the data header and information you can calculate

the interval from.

**THE COURT:** All right. What's your response?

**MR. CONNOR:** If I may, they're making this way more complicated than it really is. The preamble to Claim 5 here is essentially setting forth the structure of an MPEG bitstream. It tells you: This is how the bitstream is set up. Then you get into each individual limitation there, and it says: We're detecting the 12 ones and making a determination based on where those 12 ones exist in the bitstream, whether the particular synchronization code is a valid synchronization code or an invalid synchronization code; and from that the decoder can determine whether the -- whether it is synchronized or unsynchronized.

If you submit -- if you substitute their definition of the special pattern of ones and zeros for the 12 ones bits disclosed in the specification, the result is this is telling you that you analyze the bitstream. You look for the 12 ones. You see whether it fits the specific parameters to be a valid synchronization code; and if it doesn't, then it's an invalid synchronization code.

But at the end of the day, there really is no dispute. Everybody knows that a synchronization code is the 12 ones. There's nothing indefinite about this.

If there's some particular limitation in Claim 5 or one of the other claims that includes the phrase "synchronization

code," maybe they could have argued that broader limitation is indefinite, but they didn't.  They chose to dispute the actual meaning of "synchronization code," and on that there is no dispute.

**MR. LEE:**  Your Honor, if I may respond.

The preferred embodiment as explained in the specification may be clear; but as claimed -- and, again, the patentee should be held to what was claimed -- uses this term recklessly, and it clearly can be only one or the other in each instance.

**THE COURT:**  Why does it have to be one or the other?

**MR. LEE:**  As explained in Slide 28, Your Honor, it can -- certain instances can only be valid codes because of that data header and information from which intervals can be calculated; it only follows valid codes.

And also in the sensor and comparator limitation, one of those has to be valid in order to read in the preferred embodiment.  And, Your Honor, as -- oops.

Your Honor, again, a construction that reads out the preferred embodiment is rarely, if ever, correct.

**THE COURT:**  Well, we're not talking about construction.  We're talking about an indefiniteness argument here.

**MR. LEE:**  Sure, Your Honor.  That's definitely true, but the fact that you cannot construe this term in a way that makes this claim make sense is definitely an issue of

indefiniteness, Your Honor.

THE COURT:  Well, you're saying it has a clear terminology, and it's 12 ones in a row; right?

MR. CONNOR:  Yeah, that's exactly what it is.

THE COURT:  What would make that -- if you put that in here, what would make Claim 5 inconsistent, invalid, or whatever?

MR. CONNOR:  I mean, there's nothing.  I mean, the fact that 12 ones -- I mean, that's what the synchronization code is.  The whole purpose of the patent is to determine whether the location of the 12 ones in the bitstream is where it should be so that you know that you're synchronizing to the correct place.

THE COURT:  Right.  Well, that's why I'm asking. What's wrong with Claim 5 if you substitute in 12 ones for synchronization code?

MR. LEE:  Precisely here -- again, this is Slide 28, Your Honor -- if you have 12 ones, not every instance of 12 ones will have a data header following it as stated in the header -- as stated in the preamble, as well as in the sensor limitation at the very end, as well as the sensor comparator limitation.

If you substitute just FFF string, Your Honor -- maybe it will be helpful to just read it through (reading):

"... a sensor for sensing intervals between

successive FFF strings."

And then you have a comparator for comparing said intervals with FFF strings.  So you have -- you have FFF string intervals versus -- comparing to FFF string intervals.  You -- it doesn't accomplish what the patent sets out to do because certain -- if you're comparing it to FFF string intervals, some of those might be invalid, too.

And so, Your Honor, if you -- just by the claim language itself, it's used recklessly and the patentee shouldn't be rewarded and the person of ordinary skill in the art shouldn't be held to guess at which each instance should mean.

**MR. CONNOR:**  Well, Your Honor, they have the burden of proof here and by clear and convincing evidence, that a person of ordinary skill in the art, somebody who they have not even proposed a definition of, would have -- would not be able to understand the term with reasonable certainty, and they have that burden by clear and convincing evidence.

And they don't have any evidence to that effect.  I mean, the evidence --

**THE COURT:**  What's your response to his very specific argument; if you substitute FFFs in here, this doesn't make any sense?

**MR. CONNOR:**  It does make sense.  I mean, again, the preamble to Claim 5 lays out the structure of the bitstream.  It tells you, you know, where the synchronization codes are

located; and then you get past the comprising part and it goes into actually analyzing the bitstream to determine where the synchronization code exists, and then from that to determine whether it's valid or invalid and ultimately whether the bitstream or the detector itself is synchronized.

Following through Claim 5, if you substitute 12 ones or FFF, or whatever definition you have for "synchronization code," it still makes sense.  It's all about discriminating what the particular synchronization code is, whether it's valid or invalid, and then ultimately whether the decoder is synchronized.

MR. LEE:  And, Your Honor, my response to that is, again, if you did that, you would read out the preferred embodiment and you certainly would also read out the MPEG standard by which they had their -- they base their infringement allegations.  Just because, again, invalid codes -- FFF strings encompass both valid or invalid and they don't have data headers following them.

MR. CONNOR:  The invalid ones do not but, again, it's what the synchronization code is and the patent defines that as 12 ones.  The data header or the header following that is just part of the structure of the MPEG bitstream.

But, again, if you're importing data header following synchronization code into the definition of "synchronization code," you're importing limitations from the specification into

the claims.  The dispute here is about the precise meaning of "synchronization code" itself, which is the 12 ones.

THE COURT:  All right.  Let's go on to the next one.

MR. CONNOR:  I believe --

MR. LEE:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. CONNOR:  If we could turn back to my slides, please.

Your Honor, since ASUS is not providing any additional argument on the detector term, I believe what's left is -- one of the terms that's left is the "first header" term in the Grewe patent, the '730 patent.

Each party has proposed a construction.  They're substantively the same except for one portion, which is we propose that "first header" is "a data structure on a music chip which includes information relating to the way the music tracks were encoded in the memory of the music chip for use by the audio player in decoding the stored music."  ASUS' construction is similar except for they're attempting to limit that to a single data structure rather than a data structure.

So that the issue here is whether the first term should be construed to be limited to a single data structure, which would mean that the "first header" term would be construed identically to the parties' agreed construction regarding "global header."

And just to orient Your Honor, we'll note that this Court found the "first header" -- construed "first header" to be identical to "global header" in the *Barnes & Noble* case.

THE COURT:  I did.

MR. CONNOR:  And, Your Honor, we would respectfully submit that the evidence in the record, the intrinsic record, really counsels sort of recalibration of the way such that "first header" should be broader than "global header."

As you're aware, "first header" and "global header" both appear in independent -- separate independent claims of the '730 patent.  "First header" is used in independent Claim 1. "Global header" is used, for instance, in independent Claim 18. Both of them relate to the data format or data protocol in which the music tracks were recorded into memory.

Two other courts have also looked at the '730 patent and this specific issue.  In the Eastern District of Texas in the *Agere v. Sony* case, the Court noted "global" is more restrictive term than "first," and found that "first header" is entitled to a broader scoping global header and actually adopted Avago's proposed construction.

In the *SanDisk* case, Judge Alsup indicated that a person of ordinary skill in the relevant art at the time of the patent application would have understood "first header" to be broader in scope than the disclosed general -- or "global header."

And that conclusion really follows the canons of claim

construction where there's a general presumption that different claims, different patent claims, are intended to have different meanings.

And, Your Honor, we submit that there's really no clear evidence in the '730 patent, its specification, or its prosecution history that "global header" and "first header" are, in fact, synonymous.

**THE COURT:**  Where's the indication to the contrary?

**MR. CONNOR:**  The language in the claims.  The fact that different claim terms were used.

**THE COURT:**  Well, besides that.  Is there anything else that suggests that this wasn't just, frankly, less than precise use of interchangeable terms?

**MR. CONNOR:**  Well, I would suggest there is, Your Honor, in the prosecution history.  For instance, if you look at Slide 65 of our presentation.

During the prosecution history, they actually distinguish between the two.  They say (reading):

"The invention primarily deals with a data protocol consisting of a global header or first header containing various information."

And they go on.

Now, ASUS has said that this means that they're using them synonymously, but I believe that that's actually contrary to the plain language.  If the limitation had said instead "a

vehicle consisting of a car or a motorcycle," no one would argue that a car or a motorcycle are synonymous.  There's clearly differences there.

And by --

**THE COURT:**  Or you could say "car or automobile."  You could say that.  I mean --

**MR. CONNOR:**  Car or --

**THE COURT:**  -- so what?  How do I know the motorcycle-versus-automobile analog is more apt here?

**MR. CONNOR:**  Just --

**THE COURT:**  What's the indication?  Because of the word "or"?  Is there anything substantively here that suggests in the prosecution history that there was something specifically addressing the differentiation between the two terms?

**MR. CONNOR:**  I mean, it's more inferential than specific.  There's this reference here in this particular response to an office action.  There's another one which I believe is Exhibit 11.  It's Docket 188-11 where, you know, they specifically describe Claim 1 independently; and then they move on to the Claims 18 and 31, which use the "global header" term.

I mean, they're separating them out.  They don't -- other than a couple sloppy instances, they don't conflate Claim 1 with Claims 18 and 31.  They stand on their own.

And, you know, there are, to be sure, a couple instances where they talk about a global header and they include in their citation Claim 1, which has the "first header" term; but throughout the majority of the prosecution history, they're actually talking about Claim 1 and Claims 18 and 31 separately. They're not talking about them the same.

So at most the prosecution history is ambiguous.  I would say that the specific references, such as we have here on Slide 65 where they're talking about the terms and they use the word "or" -- they don't say "slash," they don't say "i.e.," they don't -- they talk about them separately -- indicates that the two terms are different.  And because of that, "first header" -- as, you know, Judge Alsup noted in the *SanDisk* case and the court in the Eastern District of Texas noted -- "first header" is actually broader than "global" and that would -- you know, that would connote a different claim scope than just saying "global header."

THE COURT:  He found there could only be a single first header.

MR. CONNOR:  Judge Alsup you're talking about?

THE COURT:  Yeah.

MR. CONNOR:  Yes, that is correct.  And one of the reasons he did so was just by virtue of this claim language here where it says "first header having" and then "at least one second header."  And Judge Alsup and Your Honor in the

*Barnes & Noble* case indicated that there could only be one, otherwise you couldn't have the hierarchical structure of headers that's required by the '730 patent, but that's not true.

You know, the presumption claim language is that a term that's listed in the singular should not be limited to the singular unless there is some specific claim language to that effect.  There's none of that here.  There's no clear disavowal of claim scope, and it's entirely consistent with the specification to have one first header followed by at least one second header, and then have a second first header followed by at least one second header.  And you can see that here on Slide 68 where you can maintain the hierarchical structure even though you have multiple first headers.

I mean, at the end of the day, there's ambiguity within the prosecution history, and perhaps even within the specification itself, as to whether the "first header" and "global header" are interchangeable, but the law is clear that you shouldn't limit the claim scope in the absence of any clear statement.  Where it's ambiguous by itself, the Federal Circuit said in this *Inverness Medical* case back in 2002 that it's inappropriate to limit a broad definition of a claim term based on a prosecution history that itself is ambiguous.

And, you know, to the extent that it isn't clear that "first header" is broader than "global header," the prosecution

history is ambiguous and that alone counsels against construing "global header" and "first header" synonymously.

THE COURT:  I'm just looking at the language again, Claim 1 versus Claim 18.  I'm not sure I understand when you look at the function and what it has, whether you call it "first header" or "global header," they have "parameters stored for use in decoding"; and in 18, "having parameters stored or spotting through encoding technique used for storing said prerecording used by the player in decoding."

They use different words but it sounds the same.  You've got to have parameters in there that tell the player how to decode.

MR. CONNOR:  That's correct.  The first header and the global header serve a similar role, but that does not mean that they are the exact same.  So the first header will also have information relating to the encoding, but that doesn't mean that the first header is limited to a single data structure. There could be more than one data structure that serves the function of a first header.

THE COURT:  Okay.  What's the response?

MR. NEWTON:  Can we switch slides?

So, Your Honor, in our slide set beginning on Slide 4 for the '730 presentation.  I think it's behind Tab 4.

So the dispute, as Avago counsel has pointed out, is whether the first header is limited to a single data structure;

that is, a single header.  So if we just look at the claim language of Claim 1 as you pointed out, I think, in your prior decision, there's no indefinite article "a" in front of "first header."  It just says "first header."

And then if it had just then said "second header," you might say, "Okay.  Maybe you could have multiple first headers and second headers."  But they use the language suggesting that there's at least one second header.  So if you just look at the claim language and were to read this just by itself, you would say, "This language suggests that there is a single first header and perhaps multiple second headers."

Now, the "first header" -- again, I think this was pointed out in a number of the decisions -- only appears in the claims; whereas, the "global header" appears throughout the specification before the claims.

And so if you adopt Avago's argument that the term "first header" is not synonymous with the term "global header," then you're just stuck with the claims, and you're stuck with Claims 1 through I think it's 17 that use "first header" and then independent claims off of Claim 1.  And if we just go back to the claim language, the claim language would lead you to think that you have a single first header and perhaps multiple second headers.

So that's in the scenario where they're not synonymous.  The claim language leads you to the conclusion that you've

reached previously.

Moreover, if you're going to just look at the claim language and you're going to say they're not synonymous and you're going to try to get to a point where you say that there's a written description for multiple headers in reading "first header," there's no written description support for that.

MR. CONNOR:  To that, Your Honor, I would say "first header" is an original claim term.  As original claim term, it provides its own written description support.  So the fact that the "first header" only appears in the claims is not by itself a reason to construe "first header" and "global header" interchangeably.

MR. NEWTON:  But it is, Your Honor, in the case where you say "first header" and there's no other description of a first header having multiple first headers or any suggestion in the claim language that there might be multiple first headers.  Then there isn't written description support for a first header system that has multiple first headers.  The only support is that claim, and that claim suggests single first header with perhaps multiple second headers.

So if you go beyond a construction like that you gave previously where the first header is a single structure, then you lack written description support.

THE COURT:  Well, is the issue whether a multiple

first header is possible, or there's a first header but it can contain more than a single data structure?

MR. NEWTON:  Well, it's the latter, but there's no teaching that it could.  So the idea of the written description is to say, "Did the inventor possess that invention when he said" -- and it is a he in this case -- "when he said first header?  Do you get any indication that he believed that you could have a data structure that had more than a first header, multiple first headers, if you will?"

THE COURT:  What does that mean, "multiple first headers"?

MR. NEWTON:  Well, I guess more than one.  Is there just a single header, a data structure within the chip where you're going to have only one header, or are you going to have multiple first headers?

And reading just that claim, if you didn't look at the specification and you say there's written description support, what I would say, "Oh.  That person invented a data structure that has a first header that's going to give me the information to decode the signal; and then I might have or will have at least one second header where I'm going to have Table of Contents information."  That's what you would take as the written description for the "first header" term.

You wouldn't believe that the inventor possessed a system where I'd say, "Oh, you know what?  I'm going to have a first

header for a first group of the music songs and another header for another group of the songs." You would just simply think, "Oh. He invented a single header that had decoding information in it."

**MR. CONNOR:** And we disagree with that. I think the claims kind of reflect the hierarchical structure that you're going to have a first header and at least one second header relating to that first header, but there is nothing in the claims that indicates it's limited to a single data structure; that you couldn't have multiple sets of, you know, first headers and second headers in that hierarchical relationship.

**MR. NEWTON:** And, again, there's nothing limiting to that, but there's nothing that would indicate to a person skilled in the art that the inventor clearly had in mind a system that had multiple first headers.

**THE COURT:** What would be the function of multiple first headers?

**MR. CONNOR:** That you have -- that there's different information relating to the encoding for different sets of music throughout the chip. I mean, if you had --

**THE COURT:** We talked about that in my original *Barnes & Noble* opinion.

**MR. CONNOR:** You did, that's correct.

**THE COURT:** That would be the only function, is if you had different encodings for different tracks?

**MR. CONNOR:**  That would be one of them.  I mean, you could also have, you know, the first header repeated throughout so that you ensure synchronization throughout the bitstream; or, you know, you make sure that the music is being decoded in a proper way.  I mean, the first header is all about how the music was encoded.  So as long as you're talking about how to properly decode the music for the audio player, I mean, that's the primary purpose of the first header.

**MR. NEWTON:**  And, Your Honor, there's no support for that type of invention.  So if then we read the whole specification and we now assume that they were used synonymously, then we go back and the "first header" or the "global header," assuming they're synonymous, is used in the ways that you've described in your prior decision.  I mean, it's a hierarchical arrangement.  In the preferred embodiment, you grab that header right at the beginning of the memory.  You thereafter don't have to look around for that header, and you can decode every music -- or every piece of music on the chip thereafter.

So one other thing I want to point Your Honor to on Slide 8, so if you look at MP3 -- and MP3 was a prior art at the time they filed this application; and as we mentioned in the tutorials, there's a 32-bit header in MP3 -- and if you look at the size of the MP3 header compared to the data, you'll find out that that header takes up anywhere between 2.2 percent

and 33 percent of the space on the file.  And you can calculate that simply by using the equations that were in our tutorial.

Now, the patent notes -- and this is back on Slide 7 -- well, maybe it's not here -- but, anyway, the patent at one point -- I don't think it -- it may not be in this slide, but there's a place where it says that the headers should only take up in total less than 1 percent.  And in an MP3, just the headers for the first header or the global header takes up 2.2 to 33 percent of the space.  So this wouldn't even be within the goal of the invention described in the specification.

THE COURT:  All right.  Let's go on to the next one. Does that complete the '730?

(Pause in proceedings.)

THE COURT:  So what are we left with here?

MR. HOLOHAN:  Your Honor, I'll speak briefly about the '835 patent.  The sole issue -- the sole claim term in dispute with respect to this patent is "navigation data."  And if you look at Slide 54, I've tried to visualize the dispute.  The purple text indicates the language on which the parties agree, the blue text is Avago's language, and the orange text is ASUS' language.

So the parties agree that "navigation data" is data indicating the physical location of something related to a presentation stored on the optical disk.

What our proposed construction does is two things.  It

adopts the consistent usage of that term throughout the specification -- there's some examples of that on page 55 -- tying navigation data to a selected portion of the presentation data.

If you recall, the '835 patent has to do with bookmarks on optical disks. So it is the selecting of the favorite scene that is the centerpiece of the patent. That is shown on Slide 56 where these passages taken from the background of the invention talk about users having favorite scenes.

The problem that the patent is seeking to address, namely, the ease with which -- or the time -- the difficulty with which users had to keep track of their favorite scenes by writing down time codes and things like that. And what the '835 patent does is it automatically saves navigation data related to user-selected scenes.

And the second point I wanted to make with respect to "navigation data" is that ASUS asserts that their definition is the plain and ordinary meaning. There's no evidence in the record that there is any plain and ordinary meaning of "navigation data." They haven't put in an expert declaration or cited any other extrinsic evidence showing that a person of ordinary skill in the art would understand "navigation data" in a vacuum to mean a particular thing.

So unless Your Honor has any questions, I'll yield the floor.

**THE COURT:**  Well, there's reference to "current navigation data."  So doesn't that suggest -- what's the difference -- what would be the difference between "current navigation data" and "navigation data" if we adopt your construction of "navigation data"?

**MR. HOLOHAN:**  I think "current navigation data" just emphasizes that in that particular point in the claim, it's that selection that is being stored.

If you read the claim, it's not the case that navigation data is sort of -- is necessarily constantly flowing from the disk into the controller.  It's just that the controller is configured to receive navigation data.  And the current navigation data is -- again, when the user selects a particular scene, the current navigation data based on that selection is what's stored.

**THE COURT:**  Well, let's see, Claim 1 (reading):

"There's a control unit coupled to receive identification data and navigation data, wherein the control unit responds to the output signal by producing the current navigation data, wherein the current navigation data identifies beginning of the user-selected portion of the presentation currently being played."

Doesn't that suggest your construction is really the construction of "current navigation data"?

**MR. HOLOHAN:**  Your Honor, if the solution to ensuring

that the user selection aspect, which is the key portion of the invention, as incorporated into the claim is applying that definition to "current navigation data," that's something that we could accept.

THE COURT: But if we just substituted the word -- your construction of "navigation data" into "current navigation data," it would be "current data, including indicating the physical location of the beginning of the selected portion of a presentation stored on the optical disk identifies the beginning of a user-selected portion of the presentation." It seems redundant there.

MR. HOLOHAN: Your Honor, I think it's consistent with the claim language and the specification, and I think it at least has the -- I think it's worth incorporating that into the claim term because it is so critical to the patent to clarify that that's what the navigation data is, particularly in light of the consistency of the repeated using of that phrase throughout the specification.

THE COURT: All right. What's your response?

MR. NEILSON: Can we please switch to the other slides?

I'll first address just the second point first about whether it's worthwhile to construe "current navigation data" as they propose for "navigation data."

As an initial matter, we didn't brief that issue; but even

if we did, if you turn to Slide 7, it's Tab 3 in ASUS' presentation, you'll see we've pulled out every instance of the "current navigation" definition independent claims in the patent.

And we would agree with Your Honor that their definition is just superfluous.  We think it's just going to create confusion because every single one of them talks about the beginning of the user-selected portion or the beginning of the selected portion.  It also contains -- some limitations contain other information about the presentation currently being played.  And to -- basically their definition, if applied to "current navigation data," would be importing these limitations into a definition and they're expressly in the claims.  So our view would be that would do nothing more than create confusion about what this means.

THE COURT:  Okay.

MR. NEILSON:  And then you addressed our main point about the distinction between "navigation data" and "current navigation data"; but just to reinforce that, if you look at every claim, it talks about retrieving navigation data from an optical disk.  None of the claims talk about that retrieval being in response to any sort of selection or input.

It's only after the user does the input that the control unit produces what's consistently referred to as the "current navigation data."  And, again, the idea of the beginning of the

user-selected portion of the presentation is an express limitation.

THE COURT:  So how does this -- is navigation data something that exists and just becomes operational when the user selects or -- I guess maybe you can explain to me again what is "navigation data."  Is it something that is -- is that something that's being recorded or taken off the disk drive unit, or is it just there when needed?

MR. NEILSON:  So it definitely exists on the disk when needed.  So if you look at Slide 6, this is showing -- in the patent they refer to this book *DVD Demystified*.  It's kind of, you know, if the optical disk happens to be a DVD, here's a -- you know, look at this book if you want to see how data is organized on there.

And then I just pulled a figure from it, and basically you can see the presentation data and the navigation data just reside on the disk to help you navigate to the presentation basically.

And in the context of the patent itself, even if you look at Figure 1, just the flow of how this works, the disk drive unit is connected -- disk drive unit 12 in Figure 1 is connected to the control unit 16, and you can see that the input device is also connected to the control unit 16.

And so --

THE COURT:  Where are we looking at now?

**MR. NEILSON:**  Sorry.  Figure 1 of the '835 patent.

**THE COURT:**  Is that up on the screen?

**MR. NEILSON:**  It's not.  I'm sorry, Your Honor.

(Pause in proceedings.)

**THE COURT:**  All right.

**MR. NEILSON:**  And this goes back to the tutorial a little bit.  So if you look on the left side of Figure 1, there's an input device 14, a disk drive unit 12, and then to the right of the input device is this microprocessor or control unit 16.

And as you can see, the flow goes from the disk drive unit to the control unit, and that would be the identification data for the disk and then the navigation data that the control unit is pulling off of it.  The input device isn't connected to the disk drive unit at all.  It's only connected to the microprocessor.

So the microprocessor is going to be receiving the navigation data regularly, otherwise there's no way that an output signal from the input device could capture a specific instance of playback.  It would just be happenstance if it happened to download navigation data at the same time that someone pressed the control unit.

So by operation, I would refer back to that *DVD Demystified* picture where the navigation data is the data that's built into a DVD that allows you to find -- to basically

navigate the data that's on the DVD because it's not like a tape where it's all stored in order.  It can be stored in multiple locations, and it's just a feature of, say, when the optical disk is a DVD, of finding where that data is.

So the control unit would be regularly receiving the navigation data from the disk drive unit, and then only when the user uses the input device would it take the snapshot.

**THE COURT:**  So it's constantly receiving navigation data as it receives presentation data?

**MR. NEILSON:**  Yes, Your Honor.

**THE COURT:**  And then when called for, the data is right there, "I don't want this scene"?

**MR. NEILSON:**  Right.

**THE COURT:**  Okay.  Give me the last word.

**MR. HOLOHAN:**  Your Honor, that's certainly one embodiment of the invention.  As I said earlier, I believe our construction gives life to the claim by bringing in the consistent usage and the critical function of the patent.  It sounds like the parties are in basic agreement that those aspects, the physical -- certainly as to the physical location, also as to the user selection as present in the claims.  Our construction simply makes that explicit.

**THE COURT:**  All right.  So is that -- have we covered all the claims, all the terms?

**MR. NEILSON:**  Yes, Your Honor.

**MR. HOLOHAN:**  Yes, Your Honor.

**THE COURT:**  All right.  I will take the claim construction under submission.

**MR. HOLOHAN:**  There is one more patent.

**THE COURT:**  Oh, there is one more?

**MR. SIPIORA:**  No.

**MR. HOLOHAN:**  Okay.  I apologize, Your Honor.

**THE COURT:**  All right.

**MR. NEWTON:**  Your Honor, I think this is easy.  We're basically in agreement on the status.  The only dates that we put in that they didn't want to adopt are dates for the 4.1, 4.2, and 4.3 disclosures.  And harkening back when we had the third-party Funai here and we decided that it made sense to go ahead and proceed through that process, I think it makes sense in the follow-on case to do the same.

By the time we are done with the 4.3s, that would be in October of 2016.

**THE COURT:**  Yeah.

**MR. NEWTON:**  At that point we'd tell you, "We think there's one or two additional disputes that didn't get resolved in this case that need to be resolved."  We'll also by that point have gone through expert reports in the first case.  So if there's any nuances or one of these things where we're interpreting the interpretation like you say it means "predetermined" and we have an argument about what

"predetermined" is, perhaps we come back for a short help clarification.

I don't right now anticipate that that's going to happen; but, by the same token, I think it's good for the parties to go through the process to lock each other down as to what our claim construction positions are.  If it's just simply copying what we did before, I think it's almost no work.  It's an e-mail.  If we do find there's some additional support or problems in the claim construction, then, fine.

So I don't feel like we're burdening either side too much by having to do that; and if there are new claim construction disputes, we probably ought to get them resolved, and I would imagine we may be resolving them in the Avago I case along the way anyway.

And Avago I, just for your reference, trial there is February 2017; expert reports are due in that case, I think opening, August 4th; rebuttal 21 days later, August 25th; and then summary judgment motions somewhere in that time frame. And so if there are new claim construction issues, I imagine we'll know what they are in that time frame.

**THE COURT:**  All right.

**MR. SIPIORA:**  Our response would be that there's plenty of time in this schedule to deal with this, and rather than presumptively having a burden to do this, that we just revisit it.  You're going to have a claim construction order

out before August 31 I predict; and when we have your claim construction order, we can consult.  If they think or we think that we need to do this -- that is, do the additional disclosures referenced here in 4.1, et cetera -- that we would at that time approach you with a proposal on that, either have a hearing or not -- or, you know, a CMC conference.  But right now the idea is they're putting this in there as if we need to do this so we'll have to gear up to do it.  We'd just as soon wait to see whether it's necessary.

THE COURT:  Well, but if it's set out far enough so it's just provisional and sort of a placeholder but you know that there is a timeline -- I guess unless there's something objectionable, you think these are coming on too quickly -- I mean, assuming it takes me some time to get out a claim construction -- let's say a couple of weeks, several weeks -- this is now May -- you know, sometime in June, are you suggesting that the August 31st date for 4.1 is too quick?

MR. SIPIORA:  It really depends on you, Your Honor, as you know.  And all I'm saying is we have plenty of time to build this in if we need it.  Obviously, you know, your expectations, I expect just what you said, is sometime in the next month or two you'll have it out and we'll know; but for any reason you go longer, we'll be doing this work for no reason.

It seems to me that we can talk to each other.  We talk to

each other regularly.  If there's a need to have these dates set, we can set it after you have issued your *Markman* ruling.

THE COURT:  Your thoughts?

MR. NEWTON:  Your Honor, I'd just like to lock each other down on our positions.  I think it's good to know in writing that, "Here's the terms you thought needed to be construed.  You can't come back later and say, 'Oh, we should have done something different'"; or even when we're doing expert reports, I'd like to know here's where the disputes are, here's where they're not, we've resolved everything that needs to be resolved and our positions are on paper.

And I don't think it's geared up for a lot of work.  I mean, presuming our positions don't change, I'm going to go to my Word file or my PDF file and I'm going to say, "You know, Mr. Sipiora" -- or Mr. Holohan, probably -- "here's our 4.1s." And on the 4.2 we'll say, "Anything to discuss?"  "No."  And then the 4.3 we'll put in so it's in the court and in the record a joint claim construction statement that clearly states our positions.  And, again, that would be just a cut and paste of what we've done before.

THE COURT:  All right.  Well, I'm going to go ahead and set dates either commensurate or very close to what you have suggested.  Obviously, that can be subject to revision. Should it take us longer to get out the claim construction than I thought and it doesn't leave you enough time before you, you

know, start to gear up, obviously you should contact the Court and say, you know, "Let's move these dates back."  There's some flexibility there because they're far enough in advance and away from the proposed trial date that we've got time to slip that.

I would like to have a schedule and maintain, you know, discipline here.  So I'm going to go ahead and set all those dates, and as well as a trial date.  It looks like I can give you an October 23rd, 2017, trial date, but I will set forth the schedule and try to adopt as much of your proposed schedule as possible.

**MR. SIPIORA:**  Very well.

**THE COURT:**  And then I understand you've got -- in terms of ADR, you've got a mediation scheduled coming up I see; is that right?

**MR. SIPIORA:**  Yes.  The only thing I'd say -- we haven't spoken about this actually because the order is fairly recent -- but we've got an existing relationship with another JAMS neutral, Mr. Brainerd, and I'm inclined to think that we'd probably be better off going back to him rather than going to a new mediator.  So I would expect we could talk about that, but we would propose that we're fine with the proposal except we would ask that Mr. Brainerd be our designee.

**MR. NEWTON:**  Yeah.  And talking right here is good enough for us.

**THE COURT:** All right. That's fine. If we need -- I know -- Betty, should we get out an amended order, then, referring this to private mediation with Mr. Brainerd instead of court sponsored?

(Courtroom deputy and Court conferring.)

**THE COURT:** Oh. Betty asked whether we need to set a claim construction date in the second case. I think we can reconvene. I mean, if we get to the point where we actually have -- we've gone through 4.1 through 4.3, at that point we can set a date probably towards the end of the year or something like that.

**MR. NEWTON:** Yeah. I think there's six months there, Your Honor. I mean, October is when we say we needed one, and expert reports aren't due till March. And I suspect it would be a short hearing, a few terms at most.

**THE COURT:** Right.

**MR. SIPIORA:** I agree.

**THE COURT:** All right.

**MR. NEWTON:** And in good faith right now, I don't think there's going to be any terms.

**THE COURT:** I hope so. I hope actually you have success with Mr. Brainerd. This is going to be global discussions you're having, I take it, for both cases?

**MR. SIPIORA:** Yes.

**THE COURT:** All right. I will rerefer this back for

private mediation with Mr. Brainerd, withdraw the referral to our ADR unit. And do you have any plans to go back? Is there a time frame to go back to the mediator?

**MR. NEWTON:** So, confidentially, my understanding is we have a lawyer who kind of deals with that, and he's, I believe, talked to your guy and talked -- I don't know if he's talked to Brainerd, but I think there's some discussions that have taken place.

**THE COURT:** Okay.

**MR. SIPIORA:** I know the parties are speaking. I don't know where they are relative to the question of mediation, but there's been ongoing dialogue that's continued since Mr. Brainerd's mediation and he's been involved with part of that.

**THE COURT:** Well, I'd like to put some kind of time frame. Why don't I say, you know, I'm going to refer this back -- refer you-all back to private mediation to be completed by -- we can choose a date well out there.

**MR. NEWTON:** I think September is probably a good time because we will have completed expert reports. People will be better able to evaluate. Perhaps the IPR stuff will be done by then and we'll know.

**THE COURT:** Say mid-September?

**MR. NEWTON:** That's fine with me.

**THE COURT:** Okay.

**MR. SIPIORA:**  That's fine.

**MR. NEWTON:**  Is there a football game out here?

**THE COURT:**  Well, there always is.  Well, actually, I take that back.  There used to be.

The 15th, is that a weekday or what is that, Betty?

**THE CLERK:**  September 15th at 10:30.

**THE COURT:**  That's the date to complete mediation.

**THE CLERK:**  Oh, for mediation.  Sorry.

**THE COURT:**  And then in terms of further status conference, we probably should convene around that period as well, shortly thereafter.

**THE CLERK:**  September 29th --

**THE COURT:**  For status.

**THE CLERK:**  -- at 10:30.

**MR. NEWTON:**  We'll make it work.

**THE COURT:**  All right.  Good.

Well, we will get to work as soon as we can on the claim construction, but I hope that you can score some success with Mr. Brainerd in this matter.

**MR. SIPIORA:**  Thank you, Your Honor.

**MR. NEWTON:**  Thank you for your time, Your Honor.

**THE COURT:**  Thank you.

We don't have a status conference in Avago I.  Maybe we ought to align that with Avago II status conference and make that a double.

THE CLERK:  Same date, September 29th.

THE CLERK:  Same date, September 29th.

MR. NEWTON:  All right.  Thank you.

THE COURT:  Thank you.

(Proceedings adjourned at 3:39 p.m.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, August 23, 2016

_____

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter